**UNITED STATES v. BAYER et al.**
No. 305, Docket 20229.

Circuit Court of Appeals, Second Circuit.
Aug. 14, 1946.

Charles H. Tuttle, of New York City (Archibald Palmer and I. Maurice Wormser, both of New York City, on the brief), for appellant Samuel Bayer.

I. Maurice Wormser, of New York City (Max E. Sanders, of New York City, on the brief), for appellant Elias Bayer.

Roger Robb, of Washington, D. C. (Samuel T. Ansell, of Washington, D. C., on the brief), for appellant Radovich.

John F. X. McGohey, U. S. Atty., of New York City (Samuel Rudykoff and Edward C. Wallace, Asst. U. S. Attys., both of New York City, on the brief), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal presents some important problems in the administration of criminal justice. The indictment, based upon 18 U.S.C.A. § 88, charged all three of the defendants with conspiring to defraud the United States of the faithful and unbiased services of United States army officers, especially defendant Radovich. The conspiracy which it alleged was in substance that defendants Samuel and Elias Bayer arranged to become acquainted with, and to lavish gifts upon, various army officers in order to secure special noncombatant service for two soldiers closely related to them and in particular to give defendant Rado-

vich some $7,000 to induce him to keep these men within the United States. After a verdict of guilt, with recommendation of clemency, the three defendants were given sentences of imprisonment ranging from a year and a day for Radovich and eighteen months for Elias Bayer to two years for Samuel Bayer, with additional substantial fines for the two Bayers. All appeal.

Samuel and Elias Bayer are two brothers engaged in the manufacture of yarn and thread in a corporation under the name of Plymouth Thread & Rayon Corporation, and in the conversion of thread in another corporation under the name of Thread Converters, Inc. The servicemen whose assignments they are alleged to have influenced are Martin Bayer, son of Samuel, and Melvin Usdan, nephew to both of them. War Department records introduced at the trial show a series of transfers by which these soldiers were moved, sometimes with extreme rapidity, from unit to unit throughout Eastern United States. On December 15, 1942, both Martin and Melvin enlisted in the United States Army Air Corps and within a week both were assigned, as filing clerks, to Base Headquarters at Mitchel Field, New York. April 15, 1943, they were transferred to the First Fighter Command at Mitchel Field. August 20, 1943, they became clerks to the Medical Detachment at the same field. August 28, 1943, they were transferred to separate airborne engineering units, both designated for overseas duty. November 24, 1943, they were assigned to Major Radovich's First Air Commando Group. And four days thereafter, they were transferred to the Air Transport Command, then scheduled for duty in continental United States. The case for the prosecution rested upon evidence of the methods by which these transfers were effected.

The record showed that in January, 1943, the month following the enlistment of the two soldiers, Elias Bayer became acquainted at a New York night club with two army officers stationed at Mitchel Field. The relationship immediately took on considerable warmth, for at this very meeting, Elias agreed to assist the officers in obtaining uniforms at wholesale prices. Through these two officers, Elias became

acquainted with one Lt. Col. Jacobson of the First Fighter Command; and all three officers became regular callers at the Plymouth Thread office and frequent companions of either or both Bayers on social occasions. In the spring of 1943, members of the Women's Army Auxiliary Corps were replacing the male clerical help at Base Headquarters and the two soldiers were assigned to a pool of men scheduled to be shipped to other fields. Col. Jacobson, however, procured their transfer to the First Fighter Command at Mitchel Field. Jacobson testified that the Bayers had not asked him to do "anything improper." The transfer, however, was not displeasing to them; and a few days thereafter, Samuel gave Jacobson a birthday party at the Waldorf-Astoria, presenting him with four new tires.

The transfer to the First Fighter Command put the boys directly under the supervision of Major Radovich, who was immediately introduced to Elias by one of the officers mentioned above. Of the entire group, he soon became the most frequent caller at the Bayers' office and the most constant recipient of their gratuities. In addition to uniforms, which, like those of the other officers, were paid for by Plymouth Thread, he received golf clubs, travelling bags, theatre tickets, and other amenities. In July, 1943, however, he decided to transfer the boys to another field. Radovich attributed his decision to the fact that rumors of the Bayers' generosity were circulating at Mitchel Field; the Bayers asserted that Radovich's object was to extort money. Whatever the motivation, there is no dispute that he did announce his intention to make this transfer, and that, dissuaded by Samuel Bayer, he finally transferred the boys only to the Medical Unit at the same field. It is likewise undisputed that over a period of about two weeks at the time of the transfer he received from Samuel Bayer a total of $1,900 or $1,950.

The assignment to airborne engineering units bound for overseas duty came just eight days later. The Bayers' attempts to obtain the intercession of two of their original army friends failed. In late August or early September, 1943, Major Radovich left Mitchel Field to assist Col. Cochran in the organization of the First Air Commando Group, a unit being organized at Goldsboro, North Carolina, and designed to operate behind Japanese lines in Burma. In this capacity Radovich had authority to request orders for the immediate transfer of men from other units; and on November 22, he issued a special order commandeering the services of Martin Bayer and Melvin Usdan and requiring them to report not later than November 25. Within a few days of the original assignment, he requested and obtained their retransfer to the Air Transport Command, scheduled at this time for domestic duty. It was uncontested that at the time this transfer was effected, Samuel Bayer sent Elias and an unnamed individual to deliver $5,000 to Radovich in the Goldsboro railroad station and that a few days after receiving the money Radovich mailed a bank cashier's check for $500 to the classification officer at Mitchel Field. The only question left in doubt was as to the motivating force for these payments. Radovich's statement, introduced in evidence, was that, being pressed by the Bayers to take Martin and Melvin out of the airborne division, he devised the double transfer as a scheme for accomplishing that result. Statements of the Bayers, on the other hand, asserted that Radovich, entirely unbeknown to them, assigned the soldiers to his Commando Group and then demanded $5,000 for their release.

Of the many grounds for reversal urged by defendants Bayer, only two require extended discussion. As indicated in the statement of facts, the Bayers' defense was that they were the victims of a scheme of extortion on the part of Radovich. It was their contention that the boys had not received sufficient basic training to be sent overseas, that Radovich's true duty was therefore to keep them in this country, and that their own conduct was the result of his threats to violate that duty. Regardless of the trial court's opinion of the merits of this defense, defendants were entitled to have it clearly presented to the jury. Bird v. United States, 180 U.S. 356, 361, 21 S.Ct. 403, 45 L.Ed. 570; Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402; Thomas v. United States, 6 Cir., 151 F.2d

183. The first serious question is whether it was so presented.

The District Court in its charge told the jury that it was necessary for the prosecution to show an agreement to defraud, followed by one of the alleged overt acts. Then, in the passage objected to by defendants, it stated:

"Counsel for the defendants Bayer claims that payments of money by defendant Samuel Bayer to defendant Radovich were made as the result of express or implied threats by defendant Radovich to improperly and unfairly include privates Martin Bayer and Melvin Usdan in the Air Commando Group organized for an immediate dangerous overseas mission, which would be a violation of his duty as an officer.

"The Government contends that such payments of money were made voluntarily by mutual agreement in the course of the conspiracy charged.

"If you believe from the evidence beyond a reasonable doubt that at any time during the period alleged these three defendants mutually agreed to defraud the United States as alleged in the indictment, and did some act in pursuance of such agreement, they would be guilty irrespective of whether the actual payment of money were made voluntarily or involuntarily. However, as to the payment of money, if you believe that they were coerced by the defendant Radovich, that is, that they would not have been made at all in whole or in part except for Radovich's threats, then such payments would not be the result of agreement nor any evidence of a crime. And if you so believe, and also are not satisfied beyond a reasonable doubt by other evidence in the case that the conspiracy existed as charged in the indictment, you should find all the defendants not guilty, as Radovich is not here charged with extortion.

"However, in your consideration of this phase of the case, I charge you that the matter of whether or not the payments were made at the suggestion of Samuel Bayer or upon the demand of Radovich, or whether the payments were made cheerfully or grudgingly, or whether or not they were greater than Samuel Bayer expected, are immaterial if you are satisfied beyond a reasonable doubt that the payments were made by and in the course of the agreement of the defendants."

■■ There is no question but that this charge was an accurate, albeit brief, statement of the law. It set forth the position of both prosecution and defense. It warned the jury that involuntary payments could not themselves be taken as showing a conspiracy. And, since there was evidence before the jury as to gratuities other than money, it correctly stated that a conspiracy might have been proved even if the payments were involuntary. The only question is whether it was so concise and so technical as to be confusing. It is the opinion of the writer of this opinion that in spite of its brevity the charge was adequate in the light of the evidence and particularly in view of defendants' failure to make a proper request to charge or a specific objection to this portion of the charge as given. Moreover, the brevity is explainable and at least somewhat justified by the generally concise and unembroidered charge—a welcome relief from much judicial verbosity. My colleagues feel, however, that the statement was so cryptic as to be difficult to understand, if not to be actually misleading to a jury of laymen. Of course, reversal should be ordered if the charge, although technically correct, is so equivocal as to be probably misleading in actual fact.

We are all agreed, however, though for somewhat differing reasons, that the ends of justice require a new trial in this case. A majority of the court, including the writer of this opinion, find ground for reversal in a ruling excluding important evidence. To support its theory of extortion, defense called as a witness Samuel Bayer's secretary, Anne Solomon. Miss Solomon stated that on November 24,[1] Radovich

---

[1] She did not actually specify the date, but placed it, as Samuel had in his statement, on the same day that Martin Bayer telephoned his father about the transfer. Melvin Usdan had already testified that Martin's phone call was made on November 24. And the United States Attorney told the jury that this date was accurate, drawing the inevitable conclusion.

968

telephoned from Washington making an appointment to meet both Samuel Bayer and her for lunch in New York City. She also testified that it was at this meeting that Radovich informed them of the transfer of the servicemen to Goldsboro and demanded $5,000. A clerk in the Washington office of the Army Air Forces, however, had already testified that on November 24, Radovich had telephoned her from Goldsboro, North Carolina, requesting the transfer of the soldiers to the Air Transport Command.

The United States Attorney at the very end of his summation pointed up the conflict in the testimony by referring to the Bayers' story as "just another of the falsehoods" and as showing "the absurdity of Samuel Bayer's claim of extortion." Defense counsel, surprised by the turn of events, started a check of the records of the Bayers and of the telephone company and found in the Bayer file a bill showing a collect call from Washington on November 24. While the court at the outset of its charge did state that it would not allow the case to be reopened for evidence, it achieved the same result by stating the existence of the bill and what it showed; but then it added quite pointedly that "the record does not show from whom the call came." After the jury retired, defense counsel obtained from the telephone company a memorandum slip showing a call on November 24 to the Bayers by a "Capt. Ravish" from Arlington, Virginia, the location of the War Department where Radovich had been working with the Military Personnel Division. The trial judge refused to place it before the jury, however, stating that it was not shown as coming from Washington and that the proceedings were already irregular and he would not make them more irregular by calling the jury back for the further evidence.

■ Under the circumstances which had developed, the court's refusal to allow the correction of the evidence, made necessary by the convincing showing of the telephone slip, was error in the view of a majority of this court. There was no real doubt that the slip, although designating the call as from Arlington, just outside Washington, was descriptive of the call in question. The issue as to the fact of the call or Radovich's actual whereabouts on a particular day was, of course, not determinative; and the introduction of the slip at this time undoubtedly would have somewhat overemphasized its significance. But the summation of the United States Attorney and the charges of the court had already given the issue an entirely undeserved importance in the eyes of the jury. How important the matter had become was unmistakably shown by the jury itself. After four hours of deliberation, it returned to ask further instructions, one juror stating that several of them desired to hear again this part of government counsel's summation. And when recalled by the court eight minutes later, another juror had asked for references to pertinent parts of the testimony. Obviously the jury—however erroneously or for whatever reason—was vitally concerned with the question. While ordinarily a trial judge has a large area of discretion as to the reopening of a case for additional evidence, we think that in view of the importance which this issue had assumed the jury should not have been left with a partial and a misleading picture of the facts.

■ Other assignments of error on behalf of the Bayers are without merit. It has been often held that an indictment based on this statute alone is valid without charging breach of any other federal statute. See United States v. Keitel, 211 U.S. 370, 393, 29 S.Ct. 123, 53 L.Ed. 230; United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631. There was ample evidence to convict and to show Elias Bayer's participation, notwithstanding his vigorous contention to the contrary. And the summation for the prosecution was restrained and decorous.

■ In view of the charge of conspiracy, reversal as to the Bayers necessitates also a reversal as to Radovich. In addition he makes two claims of error which require discussion. The first is in the admission of a confession which he made to a Special Agent of the Federal Bureau of Investigation on March 15 and 17, 1945. The confession was a written statement reciting

in some detail that Radovich had effected transfers for the two servicemen for a consideration of $7,000 received from the Bayers. His counsel strenuously opposed its admission at trial, on the ground that the circumstances under which it was given made it involuntary under McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829. The court on voir dire held the confession voluntary and admissible. We think this was error.

Immediately upon his return from the Chinese-Burma theatre, Radovich was ordered to report to Mitchel Field, New York, where, on August 9, 1944, the Commanding General directed his confinement pending trial by general court-martial. Although charges were preferred on August 10, they were not served on the defendant or referred for trial until May 29 or 30, 1945. Meanwhile, until September 16, 1944, or for approximately five weeks, he was confined to a heavily guarded ward for the insane at the Mitchel Field hospital. Neither the prosecution nor the defense offered any professional evidence as to his mental condition at this time, though a lay attendant stated that, while fretful and crying at the time of entry, he showed no signs of abnormality or need for restraint while there. There was ample testimony, however, that he was deprived of his regular clothing and forced to eat under supervision, at first, with a fork and spoon, later with only a spoon. The regular attendant stated that he was denied all use of the telephone, even for Mitchel Field calls, for approximately ten days and that, although he expressed his desire to consult an attorney, he was not allowed to do so during that period. He did, however, see counsel sometime in the first half of September; and one attendant stated that he believed it was prior to the initial confession on September 5 or 6. After September 16, he was under only administrative restriction at Mitchel Field, and after January 2, 1945, he was allowed greater freedom at the Field and permitted to go off it with the permission of the Base Commander. The confession in evidence was made at the United States Court House in New York City on March 15 and 17.

Article 70 of the Articles of War, 10 U.S.C.A. § 1542, provides that when any person subject to military law is placed in arrest or confinement "immediate steps" will be taken to try him or to dismiss the charge and release him. And it specifies that "when a person is held for trial by general court-martial the commanding officer will, within eight days after the accused is arrested or confined, if practicable, forward the charges to the officer exercising general court-martial jurisdiction and furnish the accused a copy of such charges." The trial court construed the words "if practicable" as giving the military authorities peculiarly broad discretion and concluded that there was no illegal detention within the meaning of the McNabb principle sufficient to vitiate even the September confession. But these words, given a natural interpretation, would appear to have been inserted to provide for unusual situations arising out of the peculiar exigencies of military life. The article is mandatory in tone and expressly provides for the punishment of any officer responsible for unnecessary delay in investigating or carrying a case to conclusion. It does not seem significantly different in purpose from the various statutes cited in the McNabb case. Hence it ought not to be so construed as to make the McNabb principle applicable only where detention is by civil authorities and not where it is by military authorities. The taint of illegality found in that case seems decidedly present here where detention had existed not for two days, but for more than a month, prior to confession.

The government contends that the admissibility of the September confession is a hypothetical question having no bearing upon the March statement introduced at trial. But this argument ignores the practical realities of the situation. It is true that Radovich was not confined on March 15 or 17, 1945, and an original and independent confession made at this time would obviously have been admissible. But the present statement was not such a confession. The agent to whom it was given sent for the defendant to come to the FBI office to make a statement, and he testified that his purpose in doing so was to record certain bits of information that he had meanwhile

remembered and to incorporate the two statements into one. He was not positive at whose suggestion the September confession was brought out, but he knew that it was on his desk during the entire interview and that both he and Radovich read it before Radovich made his second statement. Government counsel refused to produce the September confession at the trial, but the court, who examined both, stated that there was no conflict between the confessions on any material matter. On these facts, we think the second statement was patently the fruit of the earlier one and that it was equally inadmissible. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

 Secondly, Radovich also urges that the District Court should have sustained his plea in bar to the indictment on the ground of double jeopardy. He had previously been tried by general court-martial for conduct unbecoming an officer and gentleman under the 95th Article of War, 10 U.S.C.A. § 1567, and for violation of the 96th or general article, 10 U.S.C.A. § 1568. The specifications on both charges were identical, namely the receipt of $7,000 for effecting the above-discussed transfers of Martin Bayer and Melvin Usdan; and the defendant was found guilty and sentenced on both charges. There is no question but that the principle of double jeopardy applies as between military and federal civil courts, Grafton v. United States, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084, 11 Ann.Cas. 640; Note, Double Jeopardy and Courts-Martial, 3 Minn.L.Rev. 181; and if the conviction were a final one, we should have little doubt but that it should be held to bar the present prosecution. The fact that the indictment charges a conspiracy to defraud under 18 U.S.C.A. § 88 does not obscure the fact that, from any realistic viewpoint, the offenses are identical. It is of course true that cases have held a conspiracy to do an act and the act itself to be separate offenses. Carter v. McClaughry, 183 U.S. 365, 22 S.Ct. 181, 46 L.Ed. 236; Fall v. United States, 60 App.D.C. 124, 49 F.2d 506, certiorari denied 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471. But here we have a conviction on each of the two broadest and most inclusive of military charges, where the act involved required, and was alleged to include, the participation of the other defendants. Cf. United States v. Zeuli, 2 Cir., 137 F.2d 845. Although the evidence before the court-martial is not before us, it is hard to believe that a careful distinction was made, or could have been made, between the actual giving and receiving of the money for the purpose involved and the arrangement made to that end. But the record leaves the present status of the military judgment in doubt. The United States Attorney stated to the trial court that the conviction had been reversed upon the review provided by Article 50 1/2, 10 U.S.C.A. § 1522; and by the terms of Article 40, 10 U.S.C.A. § 1511, no proceeding in which an accused is found guilty by court-martial shall be held to be a trial to bar a further trial for the same offense "until the reviewing and, if there be one, the confirming authority shall have taken final action upon the case." But defense counsel had no notice of the reversal, the reversing judgment was not introduced, and there was no showing as to why or with what directions the conviction had been set aside. Determination of whether or not jeopardy attached may therefore be more appropriately made when the full facts are in evidence on a new trial.

Reversed and remanded.