**J. G. METOYER, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 13970.**

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 26, 1957.

Decided Nov. 13, 1957.

Mr. Belford V. Lawson, Jr., Washington, D. C. (appointed by the District Court), for appellant. Miss Marjorie McKenzie, Washington, D. C., also entered an appearance for appellant.

Mr. Carl W. Belcher, Asst. U. S. Atty., for appellee. Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll, Asst. U. S. Atty., also entered appearances for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

This case comes to us on a motion by appellant to reverse and a motion by the United States to affirm. Both motions rest on undisputed facts.

In June 1957, Metoyer was convicted after jury trial of second degree murder and duly sentenced. The District Court granted leave to appeal in forma pauperis. The record and a transcript of the trial are filed, but not printed, in this court.

Metoyer and two companions had been drinking and began to quarrel or brawl. Students of Gallaudet College undertook to stop the brawling and in a general scuffle Metoyer, according to his confession and his testimony on trial, drew a pistol and shot, not at any person but, as he thought, into the air to frighten the others and terminate the brawling.[1] His testimony is that he left the scene not knowing one of the Gallaudet students was struck by the bullet and that he died from the wound some hours later.

The following day at 12:00 noon, Metoyer was picked up by police in Maryland and held without any questioning for one hour until the arrival of Washington, D. C., police who had been notified of his apprehension. It is not disputed that the opening question of the Washington police sergeant was whether he, Metoyer, was the man who fired the gun in the brawling. Metoyer at once said he was the man and promptly related all the circumstances of the shooting which had been witnessed by three or four persons present at the scene. Eyewitnesses who had been called to the police station identified Metoyer and confirmed his story. Within 20 or 25 minutes after the first voluntary statement, preparation of a written statement was commenced and at approximately 2:15 P.M. Metoyer signed the statement which was prefaced with a recital that it could be used against him. A warrant for Metoyer's arrest had been issued in Washington but was not delivered to the officers until about 3:15 or 3:30 P.M., at which time it was served on him. At 3:30 P.M. he was arraigned before a judge of the Circuit Court for Montgomery County, Maryland at Rockville, was advised of his rights by the judge and extradition to the District of Columbia was ordered.

Metoyer now contends he did not understand that he was waiving extradition or what constituted extradition. After the arraignment hearing at Rockville, Maryland, he guided the District of Columbia police to his home at about 4:30 P.M., consented to their entering and delivered to them the pistol he had used. He was then taken to downtown Washington and again arraigned at 5:30 P.M.

On trial his confession was admitted over objection and the trial judge charged the jury to disregard the confession if they believed it was not voluntary.

Metoyer relies on Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 and on violations of Rule 5, Fed.R.Crim.P., 18 U.S.C.A., and on failure of police to inform the Maryland court of his confession and waiver of extradition when he was arraigned before that court at 3:30 P.M.[2]

Appellant urges not that the confession is a product of prolonged detention but that the "undue speed" which attended the actions of the police from 1:00 P.M., when the Washington police arrived at the jail in Maryland, until the arraignment at 3:30 P.M. in Rockville and at 5:30 in Washington, violated his rights. He also urges that failure promptly at 1:00 P.M. to advise him of his constitutional rights before he volunteered his oral confession and before he signed the written statement violated his rights under Mallory v. United States, supra.

1. Eyewitnesses testified the gun was pointed straight ahead, not into the air or the ground.

2. Metoyer signed a waiver of extradition and permission to enter and search his residence, as well as the confession between 1:20 P.M. and about 3:30 P.M.

■ Essentially, Metoyer's present complaint is that his admittedly prompt and spontaneous admission of shooting the gun to "frighten" but not to kill was attended by such a swift sequence of events that he became emotionally unsettled, was unaware and uninformed of his right to remain silent and because of this his confession is inadmissible.

It is difficult to conceive how the actions of the police could have been other than what they were. The first hour of detention was not attended by any questioning whatever, since the Maryland authorities were simply holding Metoyer and his two drinking companions for the Washington police. Their arrival within one hour after receiving notice of his detention was as prompt as could reasonably be expected. On arrival the Washington officer's first obligation was to determine whether Metoyer was the man they sought and the first inquiry, directed to identification rather than general interrogation was described thus:

> "When I first got there at 1 p. m. and was introduced to the three [suspects], at that time, I immediately talked to the defendant Metoyer, and I asked him if he was the man that fired the gun in this particular case, and he said that he was." R. 352.

The answer to the question not only identified Metoyer as the man sought but was itself an admission of the shooting. Even then the police took the further precaution of seeking corroboration by having eye witnesses on hand to identify him. To suggest there was "delay" in arraignment—contrary to appellant's argument in which he objects to the *speed* of the arraignment—is without the slightest warrant on this record.

The record makes plain that the oral confession began at about 1:00 o'clock—almost the moment he was confronted by the Washington police, and concluded at about 1:20. The stenographer was called and the period from 1:20 to 2:15 P.M. was consumed in the usual steps of taking down the confession, typing it, checking it and signing it. Every minute from 1:00 to 2:15 is thus accounted for by careful, painstaking, scrupulously proper police work.[3]

Until the Washington police were satisfied that Metoyer was the man sought, he should not have been either extradited from Maryland or arraigned either there or in Washington.

The dissenting opinion of our colleague sees something unfair in the perfectly correct and understandable desire of the police to reduce the oral confession to writing before the arraignment and extradition hearing in the Maryland court. The Mallory case states: "Circumstances may justify a brief delay between arrest and arraignment, *as for instance,* where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the *extraction* of a confession." (Emphasis added.) The dissent states that "about an hour of the *delay* was due to the desire of the police to get a *written* confession." (Emphasis added.) A fair definition of "delay," as used in this context, is to "put-off, to postpone, to impede the progress of."

■ Implicit in the definition—and in the dissent—is the inference that something the police should have done was not done with reasonable speed under the circumstances. Concretely then, the dissent is arguing that the police were derelict in some duty because they took 50 to 55 minutes to dictate, type, allow a reading of and signing of a confession involving a fairly complex fact situation.[3a] Thus the real thrust of the objection goes

---

3. It should also be remembered that the police came to Maryland from Washington before a warrant was prepared. This warrant was applied for at noon, when the Washington police first learned Metoyer was being held, and was sent over to Maryland by the police, arriving at about 3:30 P.M.

3a. Some of the time between 1:00 and 2:15 was devoted to interviews with witnesses who identified Metoyer.

to the very rendering of the confession to written form. This is an attack upon a fundamental concept of the law which has always favored and encouraged the writing of freely expressed declarations which are known to be of crucial importance in order to minimize litigation and disputes as to just what was said. Delay does not mean mere passage of time; it means passage of time during which that which should and could be done is not done.[4]

As to the second aspect there is not the slightest intimation of any "extraction" element and indeed appellant does not even suggest this. The essence of appellant's complaint is that the speed of the police action stilled his reflective processes and led him to tell the truth.[5]

If police are compelled to arraign all potential suspects before questioning any of them we shall have used the artificial niceties and superficial technicalities concerning our liberties to reduce genuine and important rights to absurdity—and dangerous absurdity at that. Every citizen has a right to insist that the police make some pertinent and definitive inquiry *before* he may be arraigned on a criminal charge, which even if it is later abandoned inflicts on him a serious stigma.

While we think the police action correct and in full compliance with the law in every respect and at every stage, the events prior to trial are merged into Metoyer's full confession in open court in the presence of the jury *and in response to questions put to him by his own counsel.* No significant element of the confession was denied by Metoyer on trial. On the contrary, he testified in substance as he had confessed.

■ Unless we were to innovate a doctrine that no confession of any person, however promptly and voluntarily made, is to be admissible (a concept we emphatically reject) we see no basis for any challenge to the action of the District Court. When police action is improper it deserves condemnation but where it conforms scrupulously with the commands of the Congress and the courts it should be commended.

■ We hold that there was no error in the admission of the evidence of his oral and written statements. This is particularly so in light of the trial judge's precautionary charge to consider the voluntariness of the confession.

The motion to reverse is therefore denied and the motion to affirm is granted; the judgment of the District Court is therefore

Affirmed.

EDGERTON, Chief Judge (dissenting).

I agree that the oral confession was admissible but I think the written one was not.

After the police got the defendant's oral confession that he had fired a gun, they held him over two hours without taking him before a magistrate. There was no excuse for this delay; in fact, the record makes it pretty plain that about an hour of the delay was due to the desire of the police to get a written confession. It follows that the written confession should have been excluded. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Since the oral confession was rightly admitted, it is possible that the erroneous admission of the written one was not prejudicial. But it may have been prejudicial, and the defendant is entitled to the benefit of the doubt. At the trial, he repudiated parts of the written confession, and the government attacked his credibility by pointing out conflicts between it and his

---

4. Detention *after* a confession plainly does not affect its admissibility. United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140. See also 43 Va.L. Rev. 915 (1957).

5. In other areas of the law courts accord to similarly prompt, spontaneous utterances a high degree of reliability precisely because they are made when the calculated, reflective processes are stilled. Cf. Murphy Auto Parts Co. v. Ball, 101 U.S.App.D.C. ——, 249 F.2d 508.

testimony. What, if anything, he would have said at the trial if the written confession had not been introduced, we cannot know.

I do not suggest the police should be compelled to arraign all suspects before questioning them. If a suspect is willing to talk and is not under arrest the police may question him at length. Whether they may question him not only at the moment of arrest, but also during a short journey to a committing magistrate, we need not now decide.

A suspect is more likely to make damaging statements while the police are holding him than before he is arrested, but this does not authorize them to arrest him. Arrests without "probable cause" are illegal. It is also illegal for the police to hold a man in their own custody in order to conduct a "definitive inquiry" instead of arraigning him promptly before a committing magistrate.

Only last June, in reversing a conviction this court had affirmed, the Supreme Court said: "The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. * * * It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate * * *." Mallory v. United States, supra, 354 U.S. at pages 454, 456, 77 S.Ct. at pages 1359, 1360. The decision and opinion were unanimous. The Court pointed out that in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, it had "held that police detention of defendants beyond the time when a committing magistrate was readily accessible constituted 'willful disobedience of law.' In order adequately to enforce the congressional requirement of prompt arraignment, it was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention." Mallory v. United States, supra, 354 U.S. at page 453, 77 S.Ct. at page 1358. The McNabb case was decided in 1943. Again in 1948, in reversing a conviction this court had affirmed, the Supreme Court expressly adhered to the "rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate * * *." Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 172, 93 L.Ed. 100.