Warren G. GOLDSMITH, Appellant,

v.

UNITED STATES of America, Appellee.

Earl L. CARTER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 15280, 15281.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 15, 1959.

Decided March 17, 1960.

Petition for Rehearing by the Division Denied April 15, 1960.

Petition for Rehearing En Banc Denied April 15, 1960.

Fahy, Circuit Judge, dissented.

Mr. Daniel I. Sherry, Washington, D. C. (appointed by the District Court) and Mr. Foster Wood, Washington, D. C., for appellants.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and FAHY and BURGER, Circuit Judges.

BURGER, Circuit Judge.

We granted these consolidated appeals at government expense to review convictions under a two count indictment charging robbery and assault with a dangerous weapon under §§ 22–2901 and 22–502, D.C.Code (1951).[1]

The events surrounding the arrest and confessions are as follows: one Thorley

---

1. Upon conviction Carter was sentenced to serve 2 to 7 years to run consecutively to the sentence previously imposed in an- other case as to which probation was revoked. Goldsmith was sentenced to serve from 2 to 7 years.

Coley was arrested on Sunday, April 12, 1959, in connection with activities having no relation to the crimes involved in this appeal. Search of Coley's person produced a newspaper clipping about the robbery for which appellants were convicted. Coley's explanation for having this newspaper clipping was that he had been playing cards with some friends, including Raymond Carter, who had stated that his brother, Earl, and appellant Warren Goldsmith had robbed the Kaplans, complaining witnesses here.

When they received this information from Coley, the police had a limited description of the Kaplan robbers as having been young Negro men, about 18 years old, 5 feet 9 inches to 6 feet tall, of slim build, who wore pullover sweaters and masks which covered the entire head of each.

The police picked up the two men on Monday, April 13; Goldsmith at 12:30 p. m. at his home, and Carter at his home at 12:35 p. m. They reached the precinct station about 1 p. m. At that time the police had only the vague description of the robbers in the report of the complainants, along with the unverified statement of Thorley Coley.

Mrs. Kaplan had told police that at the time of the robbery she carried in her purse the day's receipts from grocery sales totaling about $345, including some small change. An employee, Samuel Jones, and a friend named Shephard, were with the Kaplans as they left their store. According to their combined reports, two or possibly three men dashed from a nearby alley attacking Mrs. Kaplan and tearing a purse from her, and attacking Mr. Kaplan as he was about to get into his car. Jones struck at the attackers with his umbrella and they fled the scene; the whole episode occurred within a very short space of time.[2]

Although the two appellants arrived at the police station at one o'clock, the record discloses the actual interrogation did not commence until about 1:30 because the two detectives assigned to the case had to defer questioning to attend to routine office matters because other staff members were out to lunch. At 1:30 p. m. they took up the questioning, but this was interrupted at 1:52 when the two detectives were called to the District Court as witnesses. They were excused, returned to the precinct station and resumed the interrogation from 2:10 to about 2:27, when they were again called to the District Court. They returned at 3:12 p. m. to continue the interrogation. Shortly thereafter Thorley Coley and Raymond Carter, who had been sent for, reached the police station. The detectives spoke to them briefly and about 3:35 confronted the appellants with Raymond Carter, asking him to repeat in the presence of appellants what he had previously said implicating them. Raymond Carter promptly repeated the accusatory statements and at once each of the appellants promptly admitted the attack and robbery. Appellants explained in detail their planning of the robbery, their methods of operation, etc. These statements were then reduced to writing and signed. This process took a little over one hour. At about 5:00 appellants were taken to Municipal Court for formal arraignment.[2a] Arraignment proceedings began at 5:30 p. m.

2. Judge Fahy argues that the "victims of the robbery, * * * were unable to identify the robbers, who were masked * * *." This, of course, is unimportant since appellants, in their post-arraignment dispute with the victim as to the contents of her purse, voluntarily identified themselves as the robbers.

2a. ■ We have used here the terminology into which the courts and the bar have drifted over a period of years, which inaccurately describes as an "arraignment" the "Appearance before the Commissioner" under Rule 5, Fed.R.Crim.P. The hearing called for by Rule 5 is *not* an "arraignment" but a preliminary examination of the arrested person. Rule 5 (a) commands the police to take the person "without unnecessary delay before the nearest available commissioner"; Rule 5(b) requires that the person must be informed of the complaint against him and be warned of his right to counsel, to remain silent and other rights.

The Municipal Court Judge appointed counsel to represent Carter and Goldsmith at the arraignment. Appointed counsel consulted with appellants for about 15 minutes advising appellants of their right to remain silent and that any statements made by them could be used against them.[3] The Municipal Judge formally gave them the same warning. At the conclusion of the hearing the Municipal Judge ordered the appellants to be held for the Grand Jury, and at the request of the police signed an order placing the men in the custody of the United States Marshal and the police, permitting police interrogation and continued investigation "for the purpose of obtaining certain pieces of evidence, * * * confronting them with the complainant and for the further purpose of having them re-enact the offense."

Upon returning to the police station, at approximately 6:30 p. m., an officer read to the appellants their pre-arraignment written statements and asked if the facts recited were true and correct. The appellants admitted they were true. Mrs. Kaplan, who was present and heard the recital immediately took issue with the appellants as to the amount of money which they claimed to have secured from her purse. Appellants had fixed the amount as about $2 all in small change, but Mrs. Kaplan said her purse contained about $340 in bills and the balance in small change. She suggested they had not looked in the small compartment of the purse where the bills were kept. Earl Lee Carter, without being questioned by the police, answered Mrs. Kaplan saying that he and Goldsmith had not only looked through the purse but that they had ripped it to pieces before burning it in a stove in Goldsmith's house.

Shortly after 7 p. m., Carter and Goldsmith were taken by car to the Kaplan grocery store where they pointed out the shrubbery which concealed them while they lay in waiting for the Kaplans. Appellants also related in detail how they had struck Mr. and Mrs. Kaplan, how they snatched her purse and where they fled. They identified the Kaplan automobile but insisted that a broken window in the Kaplan car was damaged before they committed the robbery and was not broken by them. The conversations with the Kaplans and re-enactment of the crime took place in the presence of the United States Marshal and while they were in his custody.

In the trial, the government offered the written confessions as evidence of voluntary statements re-affirmed after the arraignment. Upon objection, the District Court held a hearing out of the presence of the jury and ruled that even though

The purpose of this preliminary examination is also to have a judicial determination as to whether the person should be held. He is not then called to plead. If the arrest is without a warrant (as with Goldsmith and Carter), a complaint must be filed at once, *i. e.*, at the hearing.

The terminology of describing this first step after arrest and "booking" as an *arraignment* traces back many years. In Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479, the Court said: "The next step [after arrest and booking] in the proceeding is to *arraign* the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights * * *." (Emphasis added.) Whatever terminology is used it is important to be aware of the significant distinction between a true arraignment under Rule 10, which comes only *after* the indictment or information, and the earlier process under Rule 5, which, as we have noted, is a *preliminary examination* and the occasion for judicial warnings as to his rights. Cf. Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829; Mallory v. United States, *supra.*

The dissent also follows the terminology used in the earlier opinions but Judge Fahy agrees that the proceeding might well be more accurately referred to as a preliminary hearing.

3. We emphatically reject the suggestion that a lawyer appointed by the court to advise at an arraignment gives "fleeting representation" to his client. Any lawyer can give all the advice needed for those purposes in a very short conference, since he need only warn the client of his absolute right to remain silent and the consequences of not doing so.

the pre-arraignment confessions were inadmissible under the Mallory case, infra, the written statements were admissible as evidence of admissions which appellants made voluntarily after arraignment. The District Judge carefully charged the jury that such statements were to be considered by the jury only if the re-affirmation of the statements following the arraignment was found by the jury to be voluntary.

Appellants took the stand and each testified that he had been beaten and terrified during interrogation, and that he re-affirmed the written statements after arraignment in fear of subsequent brutality. The jury returned verdicts of guilty as to both appellants.

On this appeal it is urged that the evidence of re-affirmation of the pre-arraignment confessions and the entire pre-arraignment confessions themselves were inadmissible (a) because the re-affirmations were "fruit of the poisonous tree," being merely re-affirmations of admissions made during a period of illegal detention after illegal arrest without probable cause; (b) because the magistrate lacked authority to release the appellants for further police questioning, or while in the custody of the Marshal; (c) because the admissions should have been excluded as involuntary; and (d) because the District Court should have granted a mistrial when a police officer testified that appellants orally admitted the crime in his presence before the arraignment; it is urged that the court's instruction that the jury should disregard this admission could not eliminate the prejudice.

(1)

■ Appellants' contention that the re-affirmation and enlargement of the formal written confessions after arraignment, including re-enactment of the crime, are inadmissible because they were the fruit of the original confessions

is answered on several bases. In United States v. Bayer, 1947, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, the defendant made a confession, while in detention and before any arraignment; this confession was not offered in evidence and the Court assumed that it was "inadmissible under the rule laid down in McNabb v. United States [318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819], * * *." 331 U.S. at pages 539–540, 67 S.Ct. at page 1398. Six months later, after having been released, he made a second confession substantially the same as the earlier one but somewhat enlarged in detail. When he was tried the first confession was not offered in evidence. The second confession was offered, received and formed the basis of his conviction. The Court of Appeals, United States v. Bayer, 2 Cir., 1946, 156 F.2d 964, 970, reversed the conviction on grounds that the second confession was the fruit of the first.[4] The Supreme Court reversed the Court of Appeals, and affirmed the conviction. In so doing it specifically rejected the "fruit of the poisonous tree" argument in this context, distinguishing the Silverthorne and Nardone cases:

"Of course, after an accused has once let the cat out of the bag by confessing, *no matter what the inducement*, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." (Emphasis added.) 331 U.S. at pages 540–541, 67 S.Ct. at page 1398.[5]

4. Cf. Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Nardone v. United States,

1939, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307.

5. Cf. United States v. Morin, 3 Cir., 1959, 265 F.2d 241, 245–246.

After the arraignment in the instant case, where appellants received both the judicial warning and counsel's advice, the appellants were not merely asked to mechanically state whether the terms of their earlier confession were true.[6] Their confessions were re-read to them and were re-affirmed. More important, as well as perhaps more damaging, the appellants engaged in a colloquy with Mrs. Kaplan and a witness, and explained fully how they had destroyed and disposed of the purse. The situation while somewhat similar to the circumstances presented by the Bayer case is stronger in that the appellants' confessions may be said to have occurred in three stages: (1) before arraignment; (2) by re-affirming the confessions immediately after the arraignment; and (3) by the highly incriminating admissions in their colloquy with Mrs. Kaplan and Sam Jones, and later at the scene of the crime. The most damaging evidence against appellants came not as a result of being interrogated by the police but in their dispute with Mrs. Kaplan as to the contents of her purse and their denial of causing damage to the car window.

██ Unless we were to hold that police interrogation and police investigation are to be proscribed both before and *after* arraignment, the contention of the appellants that there was illegal interrogation after the arraignment must fall.[7] The mere fact that a confession is made to the police, or while an accused is in custody, does not destroy its value as evidence. Once an accused has been le-

gally charged and is in lawful detention, neither reason nor authority forbid police interrogation. United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48.

██ The decision in the Mallory case did not so much lay down a radical or new concept, as re-affirm the obligation to "arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined." Mallory v. United States, 1957, 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479.

"It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully." Sutton v. United States, 4 Cir., 1959, 267 F.2d 271, 272.

The appellants not only re-affirmed their formal written statements while they were lawfully detained, but did so in utterances which were plainly spontaneous and at a time when both the judicial warning and the advice of counsel as to their right to remain silent were not more than an hour old. The Mallory case does not render inadmissible the re-affirmed confessions and new admissions so made; surely the Mallory rule would have no application to spontaneous incriminating statements about the contents of the purse made by appellants

---

6. As was the case in Jackson v. United States, 106 U.S.App.D.C. 396, 273 F.2d 521. The Jackson case is further distinguishable since there the police questioned the appellants in order to establish probable cause *for arrest*. In the instant case the statements of Coley and Raymond Carter were clearly sufficient probable cause to arrest without warrant. See United States v. Heitner, 2 Cir., 149 F.2d 105, 106, certiorari denied Cryne v. U. S., 1945, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432.

7. The second McNabb case would appear to have resolved the right of police to interrogate *after* arraignment:

"Appellants complain that after their commitment they were removed from jail for the questionings, in violation of Sec. 605, of Title 18 U.S.C.A. The point is without merit. Assuming that their removal was without authority, it does not follow that it changes the circumstances under which the confessions were made. See United States v. Mitchell, supra [322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140]." McNabb v. United States, 6 Cir., 142 F. 2d 904, 908–909, certiorari denied, 1944, 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616.

in the presence of the Kaplans and others.

The contention that the admissions were involuntary and should have been excluded for that reason was properly submitted to the jury with appropriate instructions and resolved by them. There is no basis for disturbing that finding.

### (2)

■ Appellants contend that a mistrial should have been granted because the police officer testified that before the arraignment appellants had orally admitted the crime in his presence. There are two answers to this contention: first the court's careful instructions to the jury to disregard the officer's testimony in this respect was sufficient; second, on the whole record of this case the officer's testimony was cumulative and in all events cannot be said to be other than harmless error if it was indeed error. The overwhelming testimony against the appellants, out of their own mouths to persons other than police and the pre-arrest admission to Raymond Carter rendered the testimony of the officer insignificant as well as cumulative. In some circumstances an instruction from the court to disregard evidence already heard by the jury may not be sufficient to eradicate an impression or remove a prejudice; but the testimony here, if offending, could have had no measurable impact alongside the overwhelming evidence of guilt from other sources.

The detailed facts have been set forth at some length so that the events and police conduct are in clear outline.

### (3)

■ While the Mallory case does not reach a situation covered by the post arraignment factual situation presented here, it may be useful to consider whether in the circumstances the first written confession was indeed inadmissible. Neither Rule 5(a), 18 U.S.C.A., nor any of the decisions of the Supreme Court, including Mallory, forbid interrogation per se,[8] or require that arraignment be *immediate*. The arraignment must be made promptly and without *unnecessary* delay.

■ The circumstances presented by this record disclose that when the appellants were brought to the police station at 1 p. m., it is very doubtful whether there were sufficient grounds on which to predicate a charge. But it was enough to call for inquiry into the statement made by Coley and the statement Coley attributed to Raymond Carter. The interrogation between 1:30 and 3:30 p. m. was intermittent—necessarily interrupted by other duties of the police officers, including several necessary absences from the interrogation room. Unless we are to say that the police are under obligation to furnish enough officers to conduct uninterrupted interrogation of all suspects under all circumstances, it is inescapable that most of the "delay" between 1 and 3:30 p. m. was necessary and was dictated by the practical needs of routine operations of these officers. Though the statements attributed to Raymond Carter by Coley afforded grounds for *arrest*,[9] the officers must necessarily have had some doubts about whether the two suspects should be formally charged with the crime in the face of the vigorous denials of the suspects. While it is a judicial, not a police function, to pass on this issue ultimately, it was nevertheless incumbent upon the police to investigate more thoroughly by verifying or testing the Coley and Raymond Carter statements before·

---

8. See Heideman v. United States, 1958, 104 U.S.App.D.C. 128, 259 F.2d 943, certiorari denied 1959, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767; Mallory v. United States, 1958, 104 U.S.App.D.C. 66, 259 F.2d 796; Metoyer v. United States, 1957, 102 U.S.App.D.C. 62, 250 F.2d 30.

9. We find no record support for the suggestion that "appellants were taken to police headquarters to carry out a process of inquiry to support the arrest * * *." Nor did police make such concession. Moreover, the record shows no interrogation was needed to support the· *arrest.*

deciding whether appellants should be arraigned or released.

A fair test of the purpose and character of the interrogation of the witnesses between 1:30 and 3:30 p. m. to determine whether the detention in that period involved necessary delay or whether it involved unnecessary delay, is pointed up by the process of confronting the suspects with their prime "accuser" Raymond Carter. The quantum of evidence necessary to sustain an arrest is not, in all circumstances, the same quantum necessary to make out probable cause for charging a person with the crime. The record shows that there was intermittent interrogation between about 1:30 and 3:12; the actual interrogation of the witnesses covered not longer than 1 hour and 30 minutes. It was at 3:12 when the police apparently concluded that they were not justified in deciding whether to release or arraign the suspects until confrontation by the witnesses whose reports implicated them.

If what Coley had said to the police was false, or if what Raymond Carter had said to Coley was false, the two suspects probably ought not to have been arraigned. On the other hand, if Raymond Carter was willing to repeat his "charges" in the presence of the suspects, and in a manner which convinced the officers of his reliability, then the police had an adequate basis to take the suspects before the magistrate and ask that they be held for the Grand Jury. If Raymond Carter "backed down" when this confrontation occurred, probably the suspects should have been released.[10]

 The record shows that immediately upon being physically confronted with Raymond Carter, who repeated his previous statements in the presence of the appellants, they admitted the crime. Can it reasonably be said at that point

that it was unnecessary or unreasonable for the police to take the time to reduce the statements to writing and have them signed? No court has yet held that a reasonable period of time elapsing between the occurrence of an oral confession and the time reasonably necessary to reduce it to writing for it to be signed is "unnecessary delay" and we are not prepared to do so now.

The problems presented to the police in the practical day-to-day and hour-to-hour enforcement of the law are vividly illustrated by the facts in this case. The police have duties which require balancing of competing rights and duties. They ought not make charges lightly nor should they be forced prematurely to choose between charging and releasing. Here, with the statements of Coley and Raymond Carter, they had an absolute duty to check out the information and achieve either confirmation or rejection of what Coley and Raymond Carter had repeated to them. The appellants, in common with all other citizens, have a right to insist that they not be taken to a magistrate and charged with a crime solely because they fitted generally the meager description of the assailants, or because the statements of Coley and Raymond Carter tended to incriminate them. Only when Raymond Carter was willing to repeat his statements in the presence of the appellants were the police in possession of sufficient information to warrant charging them with the crime. See Metoyer v. United States, 1957, 102 U.S. App.D.C. 62, 250 F.2d 30. Indeed, all that we have stated was implicitly recognized by the Supreme Court in Mallory, when it sanctioned a brief delay "where the story volunteered by the accused is susceptible of quick verification through third parties." 354 U.S. at page 455, 77 S.Ct. at page 1360.

---

10. In Metoyer v. United States, 1957, 102 U.S.App.D.C. 62, 65, 250 F.2d 30, 33, we considered this problem:

"If police are compelled to arraign all potential suspects before questioning * * * we shall have used the artificial niceties and superficial technicalities concerning our liberties to reduce genuine

and important rights to absurdity * *. Every citizen has a right to insist that the police make some pertinent and definitive inquiry *before* he may be arraigned on a criminal charge, which even if it is later abandoned inflicts on him a serious stigma."

**■■■■** The limits on interrogation for the purpose of checking the operative facts can be gleaned from Mallory itself. The questioning cannot be for the purpose of "eliciting damaging statements to support *the arrest.* * * *" (Emphasis added) 354 U.S. at page 454, 77 S.Ct. at page 1359. There cannot be prolonged or intensive questioning "easily gliding into the evils of 'the third degree.' " 354 U.S. at page 453, 77 S.Ct. at page 1358. If a suspect, arrested or not, denies knowledge of a crime, the police are entitled, if indeed not obliged, to confront him with those who have implicated him. This is not unlike stating what evidence or reports they have and asking whether that information is true or false. Heideman v. United States, 1958, 104 U.S.App.D.C. 128, 259 F.2d 943, certiorari denied, 1959, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767. In short, when a plea of unnecessary delay is before us, we must examine in detail all the circumstances surrounding it, taking into consideration the manner in which interrogation was conducted, the length of time involved, and particularly the purposes which the police had in conducting their inquiry, if the purposes can be discerned. We must not forget that interrogation is not an evil *per se* but an absolute necessity and that it often leads to releases, not charges.

Examining the record in this light we see that the time span actually covered by interrogation, taking into consideration all the many interruptions, was short and neither Carter nor Goldsmith was subjected to anything even remotely resembling "grilling." Since the hearsay evidence of Thorley Coley was undoubtedly sufficient probable cause for arrest, under the doctrine enunciated in United States v. Heitner, 2 Cir., 149 F.2d 105, certiorari denied, Cryne v. U. S., 1945, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432, the inquiry was not needed to bolster defendants' arrest; but it could be conducted to determine whether the suspects should be arraigned or released. This was both reasonable and necessary unless courts are to command arraignment and possible charging of every suspect willy-nilly, before questioning him at all.

Here it would have been a gross violation of important individual rights to charge appellants before testing the accusers and the suspects in a confrontation. Conversely, to release them without taking time necessarily involved in arranging the confrontation would have been wrong. Courts cannot rationally compel police to make this choice at 1 p. m., nor at 3 p. m., nor at any specific hour, but only after they have conducted some preliminary interrogation and after arranging a confrontation.[11]

At the risk of stating the obvious, we take note that the processes of law enforcement must, of necessity, proceed step by step.[12] They begin in a typical case with notice to police that a crime has been committed. This compels police inquiry. The process of inquiry may involve some restraint on the individual liberty of some people of whom police make inquiries without arrest. It would be absurd to suggest that police must arrest a person before they can ask him questions, just as it would be absurd to require that all questioning be deferred until after arraignment. Many people to whom questions are addressed are *not* thought to be suspects—even though in some cases persons interrogated but not suspected may later turn out to be guilty.

From general inquiry—in this case asking Coley why he had the news clip-

---

11. If, for example, appellants had tendered an "airtight" alibi, that they had been working in a particular place with named people at the time the crime was committed the police surely must take the time to check such a claim and determine its probable truth or falsity.

12. Some aspects of these highly important and intensely practical problems are discussed in Judge Prettyman's dissenting opinion in Trilling v. United States, 1958, 104 U.S.App.D.C. 159, 260 F.2d 677. Compare Tillotson v. United States, 97 U.S.App.D.C. 402, 231 F.2d 736, certiorari denied 1956, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. 1502.

ping on the Kaplan robbery—police must proceed to more specific inquiry, such as checking on Raymond Carter to see if in truth he had said what Coley attributed to him. From such "leads" the police properly may well be required to question dozens of persons in the neighborhood of the crime. At the early stages or steps they are *bound* to inquire and to listen to all even though human experience teaches that they must not *believe* and act on all they are told.

A vital factor to bear in mind is that as these steps progress the burden of the law enforcement agency increases. What may constitute probable cause for arrest does not necessarily constitute probable cause for a charge on arraignment. In turn, what may satisfy a reasonable magistrate on probable cause to believe the suspect committed the crime, may not satisfy a Grand Jury. And the evidence which persuades a Grand Jury to indict may not, and often does not, satisfy a Petit Jury to convict. Hence at each stage, and especially at the early stage, when little is known that is sure, police must not be compelled prematurely to make the hard choices, such as arraigning or releasing, on incomplete information. If they are forced to make a decision to seek a charge on incomplete information, they may irreparably injure an innocent person; if they must decide prematurely to release, they may be releasing a guilty one.

However, we are not called upon to decide whether the first oral and written confessions of appellants made before arraignment were admissible, and we accept the trial court's conclusion that they were not admissible. The reaffirmation of those statements *after* arraignment, and the new and spontaneous utterances then made, which are independently admissible, remove any question about the admissibility of the substance and content of what appellants confessed.

Affirmed.

FAHY, Circuit Judge (dissenting).

The victims of the robbery, which was committed April 11, 1959, were unable to identify the robbers, who were masked and appeared to be young men. In connection with another matter a young man named Coley was arrested the late afternoon of April 12, 1959. A newspaper clipping in his possession gave an account of the robbery. On being questioned about the clipping he said he had been informed by a brother of appellant Carter that Carter and Carter's cousin, appellant Goldsmith, had committed the robbery. Appellants were arrested April 13, 1959, at about 12:30 p. m. They were taken before a committing magistrate about five o'clock the same afternoon, after a written confession had been obtained from each of them. The confessions resulted from intermittent interrogation at police headquarters conducted by officers of the robbery squad. I disregard the claim by appellants of police brutality in obtaining the confessions. Nevertheless the trial judge I think properly held that any statements given before the arraignments were inadmissible under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356. They were secured while appellants were detained in violation of Rule 5(a) of the Federal Rules of Criminal Procedure, which provides that the arresting officer,

"shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. * * * "

The following explanation of this Rule by the Supreme Court in Mallory is peculiarly applicable to the facts of the present case:

"The police may not arrest upon mere suspicion but only on 'probable cause.' The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police

headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt."

354 U.S. 449, 454, 77 S.Ct. 1356, 1359. It is quite apparent, and the officers do not deny, that appellants were taken to police headquarters to carry out a process of inquiry to support the arrests and ultimately the guilt of appellants. The situation might well be termed a classic illustration of a violation of Rule 5(a). The officers twice left their headquarters where the questioning was being conducted and went to court on other business, each time returning to the questioning. They could just as well have taken appellants along to be arraigned in obedience to the command of Rule 5(a). They delayed doing so until the confessions had been obtained, using the time after the arrests and before the arraignments to obtain no additional information except the confessions.

Our court now holds that the trial court properly admitted the confessions because, after appellants had been arraigned, accompanied by the usual warning given by the committing magistrate, they were confronted with the written confessions and admitted their truth. This transpired less than an hour after the arraignments and when appellants, instead of being committed to the custody of the United States Marshal or his Deputy, were committed to the joint custody of the Deputy Marshal and two members of the Metropolitan Police Department. This occurred under the terms of a written instrument signed by the committing magistrate and stating that appellants were,

"to remain in the custody of these officers and Deputy U. S. Marshal for a period not to exceed three hours, commencing at 6:15 PM and not to exceed until 9:15 PM, for the purpose of obtaining certain pieces of evidence, for the purpose of confronting them with the complainant and for the further purpose of having them re-enact the offense."

In other words, the appellants were in all substance to be tried then and there. Cf. Spano v. New York, 360 U.S. 315, 324–327, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (concurring opinions). The admission of the written confessions in these circumstances is inconsistent it seems to me with any acceptable method of administering the criminal law in light of the Mallory rule, or otherwise. While counsel had been appointed just prior to the arraignments—apparently an attorney who happened to be in the courtroom—and while he conferred briefly with appellants, he quickly vanished from the scene. The attorney does not appear to have been even aware of the written confessions or their inadmissible character and he did not accompany the appellants when they were taken away. Though the attorney perhaps did all that might be expected of him in the circumstances, I am unable to ascribe to the fleeting representation which occurred any significance on the question of the admissibility of the confessions. Even were it established that the attorney gave some sort of knowledgeable consent to the continued custody of appellants by the police "for the purpose of obtaining certain pieces of evidence, for the purpose of confronting them with the complainant and for the further purpose of having them re-enact the offense," followed almost immediately by eliciting from appellants statements that the confessions which had been illegally obtained were true, it would make no difference. Nor, considering realistically the continuity and proximity in time between the confessions and their reaffirmation, can the magistrate's advice to the defendant concerning his rights be given crucial significance in cleansing the confessions of illegality. I find no case indicating that these facts would do so. On the contrary, the majority decision seems inconsistent with the recent decision of this court in Jackson v. United States, 106 U.S.App. D.C. 396, 273 F.2d 521, 523. There oral admissions made before preliminary hearing were held inadmissible under Mallory. To the Government's conten-

tion that a written confession signed after judicial caution nevertheless was competent, Mr. Justice Burton, retired, and Circuit Judges Washington and Danaher unanimously replied that the signing of the document "cannot in any way be considered an independent act based upon proper counsel or as occurring after time for deliberate reflection." In United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, cited by the majority, six months had intervened to erase the alleged involuntariness of the confession. The case is not comparable to the one before us.[1]

My brethren point to the strong evidence of guilt other than the written confessions, including appellants' post-arraignment colloquies with Mrs. Kaplan and Mr. Jones, characterized by the majority opinion as "highly incriminating." I would have no problem had appellants been convicted on the admissible evidence. But when evidence obtained in violation of an important rule established by the Supreme Court is pressed upon the jury to obtain a conviction, the error in permitting this is not rendered harmless by the existence of other evidence which supports the conviction. I need not labor the point, for the Supreme Court, as it seems to me, has settled it in a situation sufficiently analogous.

In Payne v. Arkansas, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975, the Court said,

"But where, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart

from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment."

In Spano v. New York, supra, 360 U.S. at page 324, 79 S.Ct. 1202, the Court also said that it had rejected the argument that the introduction of an involuntary confession is immaterial where other evidence establishes guilt or corroborates the confession. And see Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. While Blackburn and these other cases dealt with involuntary confessions, the seriousness of error in admitting confessions obtained by a violation of Rule 5(a) calls for the same standard to govern reversibility. And see Watson v. United States, 98 U.S.App. D.C. 221, 227, 234 F.2d 42, 48.

In a very literal sense the error is not harmless when it seriously impairs the fairness of a trial. Unless this position is maintained the legislatures and the courts as a practical matter will lose control over the rules of evidence.[2] Were it to be established that the admission of damaging evidence, incompetent under established rules, would make no difference should appellate judges later conclude the jury would have reached the same result anyhow, the proper trial of cases would be seriously affected. Jury verdicts based on incompetent evidence intertwined with competent evidence would be upheld if the latter were thought by the judges to show guilt though the jury had not so determined. I think we must maintain the position that error is not harmless when it constitutes a serious infraction of the rules of evidence which have long endured

---

1. Aside from the incompetence of the confessions under the Mallory rule, the procedure subsequent to arraignment under which the prisoners were turned over to the police for the purpose stated, a purpose which was accomplished, probably rendered the confessions inadmissible as well on the ground of involuntariness as matter of law.

2. In McNabb v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819, the Court said: "But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law."

under our jurisprudence or which, if of more recent origin, have come to fruition only after long and revealing experience.

I would reverse and remand for new trials.

