**Lester L. JACKSON, Appellant**

v.

**UNITED STATES of America, Appellee.**

**No. 15754.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 14, 1960.

Decided Dec. 6, 1960.

Petition for Rehearing En Banc Denied Jan. 12, 1961.

Fahy, Circuit Judge, dissented.

Mr. William B. Bryant, Washington, D. C., with whom Messrs. William C. Gardner and Joseph C. Waddy, Washington, D. C., were on the brief, for appellant.

Mr. Stephen N. Shulman, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

7. 4 C.A.B. 670 (1944).

Before WILBUR K. MILLER, Chief Judge, and FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

We reversed a previous conviction of this appellant because on the record then before us, it appeared that the police had on Sunday, December 14, 1958,[1] purposefully failed to arraign the accused and so had illegally detained him in order to extract a confession. We held to be incompetent a confession so procured and based upon unwarned oral admissions made before a preliminary hearing had been afforded.[2] At a new trial the confession was again received in evidence after a hearing in the absence of the jury, the trial judge having determined that the confession had been shown to be competent. Appellant was again convicted and now presents as the sole issue before us, a challenge to the ruling as to the admissibility of the confession.

The police learned from an undercover informant that four men planned to gain entrance to the home of a local contractor named Marchegiani, and to rob him. On the evening of Friday, December 12, 1958, the police went to the contractor's house, informed him of the plot, and arranged to take up points of vantage in order to intercept and arrest the robbers. About 9:30 P.M. the latter appeared, three of them masked, and at gun point gained entrance to the house. The contractor was forced upstairs to where his wife and daughter were. When the telephone rang, the girl was allowed downstairs to answer it, and the contractor seized the moment to attempt to get possession of a sawed-off shotgun held by one of the robbers.

In the melee, shooting commenced, and Marchegiani was wounded by a robber. One robber, Smawley, was wounded by police and captured as he tried to escape. Another, Cross, the unmasked man, was subdued. A third, Morton, tried to escape and was killed. The fourth man made good his escape. He is our appellant.

We did not previously know, but the present record discloses, that the police immediately—that Friday night—broadcast a teletype alarm for the fugitive. The next night the police informant notified the detectives that the man they wanted was Lester Jackson and that there was a fugitive warrant for him from New York State. The informant further said that Jackson was hiding out in Cedar Heights, Maryland, where Maryland police accompanied by District officers arrested him early Sunday morning. Returned to the District by the Metropolitan Police, Jackson was detained throughout Sunday as we explained in our earlier opinion, and was not given a preliminary hearing until about 4:35 P.M.

In the new trial it was further developed that Jackson in his Sunday afternoon oral statement, made before receiving judicial caution, had admitted participation in a Buffalo, New York, robbery. Buffalo police requested Metropolitan Police to interview Jackson further, to secure, if possible, information as to one Jerome Lancaster "who was still out and wanted in this $28,000 robbery in Buffalo, New York." Robbery Squad officers went to the jail on Tuesday, December 16, 1958, for that purpose, and we will revert shortly to what happened at that time.

Meanwhile, on Sunday afternoon, appellant's oral admissions shortly before 3 P.M. prompted the police to notify the United States Attorney of developments that a preliminary hearing might be arranged.[3] Sergeant Smith made in-

---

1. The days and dates herein mentioned become important as our discussion will show.

2. Jackson v. United States, 1959, 106 U.S. App.D.C. 396, 273 F.2d 521. Certain facts there stated are now, on the present record, substantially supplemented.

3. Until those admissions were procured, the officers, as they testified, had no basis even for making up a "fact sheet" for the court, a factor of vital importance in our earlier ruling.

terim preparations to reduce the admissions to writing. The accused was informed by the police of the charge against him, was advised that he need not make a statement, and was promised nothing for his doing so. He was told that the statement if made "will be used against you in Court." He replied "I am willing to make it * * *."

The statement had been typed out, but not signed by 3:55 P.M. when word came that Judge Fickling at Municipal Court would grant an immediate hearing which occurred at 4:35 P.M. The judge fully advised the accused of his rights under Fed.R.Crim.P. 5, 18 U.S.C.A., and the case was put over for one day to afford an opportunity for the accused to obtain counsel.

From court, the appellant was at once brought back to the office of the Robbery Squad. There the statement was read to the appellant who noted two errors. Corrections were made which he initialed, after which he signed the confession at 5:06 P.M. A little later Sunday evening, at the hospital, the appellant informed the contractor of his regret at having taken part in the venture. He told the victim his version of what had happened and that he had not been coerced to confess.[4]

At 7:40 P.M. Sunday night appellant at the victim's Michigan Avenue residence, showed police where he had stationed himself, and outside, disclosed where he had discarded a rope, his masking cloth and a pair of gloves.

Monday, December 15, 1958, Attorney Bryant as counsel appeared with the accused before Judge Smith. The latter noted and counsel agreed that Judge Fickling had accorded judicial caution to the appellant at Sunday's preliminary hearing. Despite such facts,[5] we previously excluded the confession, for judicial caution, as *Mallory* put it, had come too late, and long after its purpose would have been served. We were of the opinion we had no recourse but to deny the Government any advantage from the protracted and unnecessary delay which had for its object the extraction of damaging statements, not only to support the arrest but to establish guilt.[6]

Appellant through his counsel, Mr. Bryant,[7] insists that the exclusionary rule laid down by the Supreme Court requires that we again reverse. He would have us say that the appellant could not validate the confession by later reaffirmation. A majority of the court does not agree with his contention, because of the additional developments and new evidence at the second trial.

Not only did appellant on Monday have the advice of able counsel, but Judge Smith at the second hearing observed, and appellant's attorney agreed, that on Sunday Judge Fickling had advised appellant of his rights. As noted above, the next day, Tuesday, December 16, 1958, the officers had received from Buffalo authorities a request that appellant be further interviewed concerning the Buffalo robbery, particularly as to the missing Lancaster. Sergeant Smith, who had questioned Jackson on Sunday, accompanied by Detective Allen, went to the jail on Tuesday, December 16, 1958, at 12:55 P.M. Jail procedure required the officers to fill out a form to make a matter of record the name of the person to be interviewed and the purpose. The form was then to be presented to the prisoner who was free to consent or to decline to be interviewed. The form used in this case reads:

> Mr. Smithson: This is District of Columbia Jail RC No. 632 Resi-

---

4. There has never been any claim that the appellant was forced to make the statement, or in any way threatened or abused, or that the confession was not completely voluntary.

5. except for the statements above concerning the Buffalo "angle" of which we had no knowledge until now.

6. See opinion, supra note 2.

7. Quite conversant with the problem, Mr. Bryant who successfully represented the appellant in Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, candidly conceded at the bar he had fully advised the appellant on Monday, December 15, 1958, to say nothing to the police.

dent Supervision, Jail Division, request.

"I hereby request to interview the following: Name of Inmate: Lester Lorenzo Jackson. DCDC No. 130206. Location: C.B. 2. Purpose: Investigation. Agent or Representative of MPD.C. I consent to this interview." This is checked. Signed, "Lester Jackson. Time in —12:55. Time out: 2:29 p. m. Officer in Charge, December 16, 1958, Weldon B. Drake, Detective Douglas Smith, Robbery Squad, Detective Donald J. Allen, Robbery Squad."

After appellant had so consented in writing, he was brought to the jailer's office. A jail official, the two officers and Jackson thus were present. Detective Smith told Jackson that Buffalo police wanted information about the missing Lancaster. Jackson thereupon denied participation in the Buffalo crime. The officer asked Jackson how he could on the prior occasion have supplied details as to the Buffalo affair.

We quote directly from Sergeant Smith's testimony:

He told me that he heard about the New York job, that it was common gossip out in Northeast.

I asked Jackson to tell me what he had heard in Northeast about the Tractenburg murder case.

He replied he had heard nothing. I asked him then to explain, if he could, how something that happened all the way up in New York could be common gossip in Northeast, Washington, D. C., and that a murder that had happened right here in Washington, D. C., that had received considerable newspaper publicity he could not hear anything at all about that. Jackson gave me no reply to that.

I asked Jackson if the statement that he had given me in regard to the Marchegiani case was untrue, also, and he told me no, that that statement was true. I had that statement with me and I read that statement to Jackson in its entirety. I asked him if it was a true statement and he said yes it was.

I asked him if the initials on the bottom of the first page, if they were his initials, "L. J.," and he told me that they were.

Also on that first page there was a correction made wherein I had typed the statement made, I used the word "gene," and in reading the same to Jackson he stated that he had said "Gene" but the name Raleigh should go in that place. I asked him if those corrections were made at his direction, and he said they were.

I asked him if the signature, Lester L. Jackson, on the second page was his signature, and he said that that was.

I asked him then how he could say that the Buffalo job was false and he knew nothing about it. Jackson said to me, "I am telling you I did the Michigan Avenue job because I did it. I am telling you I don't know nothing about the New York job, and that is all there is to it. I don't have to say anything to you if I don't want to. I don't have nothing else to say. You keep coming over here and pulling me in these rooms and word is going to get around I am a stoolie. If you come over here any more I am not going to say anything more. I have already said more than I should."

At this point Jackson requested the guard present to return him to his cell, and we left the jail.

■ It is thoroughly established that a conviction may not stand if it depends upon the use of evidence obtained in violation of Constitutional guaranties,[8]

8. McNabb v. United States, 1943, 318 U.S. 332, 339, 63 S.Ct. 608, 87 L.Ed. 819; cf. Walder v. United States, 1954, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503.

or of rights or immunities conferred by statute [9] or of protections arising by operation of the Rules of court.[10] The exclusionary rule announced and applied in the *McNabb* and *Mallory* cases granted to the accused the very benefits which we recognized and afforded in the first appeal.[11] Of course, the Supreme Court did "not imply that the circumstances under which evidence was secured are irrelevant in ascertaining its admissibility. The mere fact that a confession was made while in the custody of the police does not render it inadmissible." [12]

Thus if inquiry into the relevant circumstances discloses that the reason for application of the exclusionary rule has disappeared, or has been resolved, exclusion no longer is required, and the Supreme Court has made it clear that a challenged confession voluntarily given after fair warning may be competent.[13] We have so decided as to a confession reaffirmed after judicial caution has been imparted.[14]

The line between admissibility and exclusion of a prepreliminary hearing confession which later is reaffirmed must depend upon "circumstances." We have seen no case which holds that where an accused has once made a confession, excludable because of police violation of Rule 5, he is thereafter precluded from making a valid confession adducing the same subject matter, and so as to reaffirmation. It would seem that the stated reason for the exclusionary rule will fairly negate any such result.[15]

It remained here for the trial judge to conduct a hearing out of the presence of the jury to ascertain the circumstances upon which his ruling would turn. He concluded that the confession had been reaffirmed at the Tuesday interview.

We agree, for the conditions which had prompted our earlier exclusion had been removed. We must view cumulatively the effect of the series of warnings to Jackson. In the first place, the police had fully advised him of his rights before taking his written statement. The language prefacing the confession "cautioned the prisoner in almost the words of the Judges' Rules of England." [16] Next, on Sunday, he was cautioned pursuant to Rule 5 by Judge Fickling. Monday, he received emphasis of the benefits of the Rule at the hands of Judge Smith in the presence of his counsel. He had had the advantage of consultation with his own attorney who advised him of his

9. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

10. Mallory v. United States, 1957, 354 U.S. 449, 454–456, 77 S.Ct. 1356, 1 L.Ed.2d 1479 and cases cited; cf. Tate v. United States, 1960, 109 U.S.App.D.C. ——, 283 F.2d 377.

11. Jackson v. United States, supra note 2.

12. McNabb v. United States, supra note 8, 318 U.S. at page 346, 63 S.Ct. at page 615; cf. United States v. Mitchell, 1944, 322 U.S. 65, 69, 70, 64 S.Ct. 896, 88 L.Ed. 1140.

13. United States v. Bayer, 1947, 331 U.S. 532, 541, 67 S.Ct. 1394, 91 L.Ed. 1654; United States v. Carignan, 1951, 342 U.S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48.

14. Goldsmith v. United States, 107 U.S. App.D.C. 305, 310, 277 F.2d 335, 340, certiorari denied, Carter v. United States, 1960, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 168; cf. Watts v. United States, 1960, 107 U.S.App.D.C. 367, 371, 278 F.2d 247, 251.

15. Wigmore has observed, at least where "voluntariness" is in issue, that a "subsequent confirmation by the *accused's own acknowledgment* of the correctness of the confession should also relieve from any inquiry into the influence of the inducement, or into the voluntariness in general of the confession." 3 Wigmore, Evidence § 856 n. 1 (3d ed. 1940); and see Lyons v. State of Oklahoma, 1944, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481; United States v. Bayer, supra note 13. Courts have certainly so recognized where a subsequent judicial confession predicates a conviction upon the guilty plea. See, e. g., United States v. Morin, 3 Cir., 1959, 265 F.2d 241, 246; Hall v. United States, 8 Cir., 1958, 259 F.2d 430, certiorari denied, 1959, 359 U.S. 947, 79 S.Ct. 728, 3 L.Ed.2d 680.

16. Porter v. United States, 1958, 103 U.S. App.D.C. 385, 392, 258 F.2d 685, 692, certiorari denied, 1959, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257.

right to remain silent. Finally, Jackson of his own free will had consented to the Tuesday interview, as he voluntarily signified in writing. He then talked to the detectives, saying exactly what he desired to say and no more. By that time he had been fully warned and his own statement discloses he was entirely aware of what he was saying.[17]

We are convinced that the ruling of the trial judge was correct, and the Government was entitled to the evidence if the jury should find the confession to have been voluntary. That point, under unchallenged instructions, was left to the jury and really never was in issue.[18]

The conviction is

Affirmed.

FAHY, Circuit Judge (dissenting).

When this case was here before, Jackson v. United States, 106 U.S.App.D.C. 396, 273 F.2d 521, the court, relying upon Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, and other decisions, held that the conviction must be reversed because of error of the District Court in admitting in evidence a written confession which this court found had been obtained by a police officer as a result of illegal detention, that is, detention in violation of Fed.R. Crim.P. 5(a).

Appellant had been arrested at 5 A.M. on the morning of December 14, 1958, and was immediately taken to Police Headquarters. He was questioned short- ly thereafter and again for some length of time in the afternoon until he made certain admissions of guilt around 3 P.M. At this point, appellant was accorded a preliminary hearing in the Municipal Court, and was then returned to headquarters to sign a typewritten statement which contained the admissions previously made. To the contention that the signature of appellant had made competent the otherwise illegally obtained admissions because appellant had signed after having received the prescribed preliminary hearing and advice as to his rights, this court stated that the position was "untenable." As was further said:

"Jackson's signing of the document cannot in any way be considered an independent act based upon proper counsel or as occurring after time for deliberate reflection. [5] Rather, the signature was obtained as a result of a purposeful process of inquiry undertaken during a period of unlawful detention. Therefore, the challenged confession should have been excluded."[1]

The case was retried in the District Court and the same written confession was again admitted in evidence. The new evidence upon the basis of which this ruling was made consisted of testimony of the officer, who on December 14, 1958, had obtained the written confession, that on December 16, the second day following his first appearance before

---

17. Indeed, the trial judge might fairly infer that by Jackson's consent to the Tuesday interview, his statement then was intended to be self-serving. Having talked with his attorney, appellant found it desirable to repudiate his earlier admission of complicity in "the New York job," leaving it up to counsel, on the strength of Mallory, to bring about the exclusion of the confession as to the Michigan Avenue robbery.

18. Nor could it be, on the record before us. There was no suggestion or claim of coercion. The confession concluded: Lester, this statement is now read to you by Detective Smith, and we ask you if there is any mistakes in the statement, or if there is anything you want to add.

Answer by Jackson: I reckon I have told you everything. I sure do feel better about telling this. My wife told me the police would catch me some time if I kept doing wrong. If I do have to do time I know when I get out I will be better. I'm going to get me a job and do right.

I have made this statement because it is true and for no other reason. No one has made me any promises, and no one has used any force on me to make me give this statement. This is a true statement.

Signed: Lester L. Jackson.

1. 106 U.S.App.D.C. at page 398, 273 F.2d at page 523.

the magistrate, Jackson reaffirmed the truth of the confession in an interview with the officer at the jail. Pursuant to a request from the Buffalo, New York, Police Department the officer inquired at this interview about a robbery in Buffalo in an effort to find out from Jackson whether he was involved. Jackson's counsel was not present. With respect to our case the following excerpt from the officer's testimony sufficiently shows what occurred:

"Q. What did you [the officer] do with regard to 13? [13 is the exhibit number of the written confession.] A. I read that statement in its entirety to Lester Lorenzo Jackson.

"Q. Other than reading the statement to him, sir, did you question him or take any other action regarding this statement? A. I did, yes, sir.

"Q. What was that? A. I asked him if the initials on the bottom of the first page, 'L.J.,' were his initials. He stated that they were. I asked him if two corrections that were made on the first page of that statement were made at his direction and instruction, and he said they were. I asked him if the name, 'Lester L. Jackson,' on the second page of that statement was his signature, and he stated that it was.

"Q. Did he say, sir, anything to you as to whether or not the facts embodied in Government Exhibit 13 for identification were true or not? A. He stated they were true.

"Mr. Smithson: Your Honor, the Government offers 13 under the basis heretofore—

"Mr. Bryant: Well, of course I object.

"The Court: The objection is overruled. It may be received in evidence.

"Mr. Smithson: Your Honor, may I then read this?

"The Court: You may."

In my view this did not transform the invalidly obtained and inadmissible confession into a validly obtained and admissible one. It is quite clear the written statement—the confession this court held to be inadmissible—was used as the leverage to obtain its affirmation two days after it was signed. The acknowledgment of the signature then, and of the truth of its contents, cannot be said to have been independent of the illegal detention which had rendered the confession inadmissible. The statement previously signed, the inadmissible character of which could not have been known to Jackson when the interview at the jail occurred, was definitely and overtly used at that interview to obtain its acknowledgment.

The admission in evidence of the written confession which was inadmissible when made, by obtaining its acknowledgment at the jail two days later, seems to me to nullify in this case the McNabb-Upshaw-Mallory exclusionary rule of evidence. This is the second case to reach this court in recent months in which a comparable procedure has come before us, see Goldsmith v. United States, 107 U.S. App.D.C. 305, 277 F.2d 335, certiorari denied, Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 168, indicative of a pattern of conduct which, should we continue to approve it, would go far to destroy the substance of the rule which excludes a confession obtained during a violation by the arresting officials of the law as embodied in Rule 5(a).

My conclusion is not affected by the circumstances now to be referred to, but the majority opinion mentions several times, and thus emphasizes, that on Sunday, which was the 14th, Judge Fickling, advised Jackson of his rights. This advice, however, was after the oral admissions had been made. This being so, the fact that the advice preceded the written confession did not preclude this court in its previous decision from holding the written confession inadmissible, and I do not understand that the majority repudiates the earlier decision.

As to the reference to advice of counsel on Monday, and the two references to the hearing on Monday before Judge Smith, the record as to what occurred in this regard is as follows:

"The Court: The complaint indicates that the defendant has been advised of his rights, and I assume you have advised him too, Mr. Gray.

"Mr. Bryant: Yes, your Honor. I believe the complaint indicated he has been advised.

"The Court: Yes."

No advice as to his rights appears to have been given to Jackson by Judge Smith and it does not appear when or in what terms counsel advised him. We do know, however, that Jackson did not have counsel and was given no advice as to his rights until after the oral admissions which led to the written confession, and that he did not have counsel until after the written confession was obtained.

I would reverse for a new trial.