John A. NAPLES, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 16436.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 28, 1961.

Decided by Judgment Entered April 13, 1962.

Opinion Rendered May 8, 1962.

Bastian, Circuit Judge, and Wilbur K. Miller, Chief Judge, dissented.

------&------

Messrs. Albert J. Ahern, Jr., and Charles W. Halleck, Washington, D. C. (both appointed by the District Court after allowance of appeal in forma pauperis), for appellant.

Mr. Arnold T. Aikens, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Nathan J. Paulson and Frederick G. Smithson, Asst. U. S. Attys., were on the brief, for appellee. Mr. Charles T. Duncan, Principal Asst. U. S. Atty., also entered an appearance for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

DANAHER, Circuit Judge.

A jury trial having been waived, Judge Holtzoff found the appellant guilty of murder in the first degree [1] in that he killed another in perpetrating a housebreaking while armed with or using a dangerous weapon. The trial judge reduced an additional first degree charge, premediated murder, and found appellant guilty of murder in the second degree.[2]

Appellant also was found guilty of housebreaking as charged in the third count; and guilty of petit larceny. Sentence was imposed on the first count conviction only.[3]

Appellant's present counsel urge that the trial court erred:

(1) in ruling that probable cause was shown for the arrest and thereafter receiving in evidence articles searched for and seized;

(2) in admitting (a) statements shortly after arrest, made by the prisoner before he had been presented before a magistrate; (b) evidence obtained during a reenactment of the crime, because of an unreasonable delay in so presenting the accused; and (c) statements made at the jail, after Naples had been so presented;

(3) in denying the accused shortly after arrest, a mental examination by a psychiatrist of his own selection;

(4) in concluding that Naples competently waived a jury trial; and

(5) in various conclusions and rulings relating to application of the Durham rule, particularly with respect to the causal relationship of the prisoner's mental disorder to the homicide, and with respect to the nature and quality of that mental disorder.

**I**

On the night of December 16, 1958, the body of one Edna G. Jewel was discovered on the floor of her apartment at 225 Massachusetts Avenue, N.E., in the District of Columbia. An autopsy disclosed that she had died from stab wounds in the neck and chest. The apartment had been ransacked; closets and bureau drawers had been opened and their contents had been thrown on the floor. Louis and John A. Naples, twin brothers, were pre-

---

1. D.C.Code, § 22–2401 (1951). See Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961), cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962).

2. D.C.Code, § 22–2403 (1951).

3. The District Judge in his written opinion announced his purpose to recommend that the death sentence be commuted to life imprisonment for he concluded that "dictates of reason and humanity bar the infliction of a death sentence on a person such as this defendant." United States v. Naples, 192 F.Supp. 23, 45 (D.D.C.1961).

viously known to Detective Buch who on the night of the crime, was one of many officers who made a police canvass of the neighborhood. He then learned that the Naples brothers lived at number 227 Massachusetts Avenue, next door to the scene of the homicide.

The next day Detective Buch received a telephone call from an unidentified caller who stated that he had a "friend" who was known to carry a knife and who might have been involved in the homicide. The caller phoned again shortly and suggested that the officer meet him at the Palace Theater where the officer was to ask for "Louis." Buch went to the theater and there recognized Louis Naples who then told him that it was his brother, the appellant here, to whom he had referred. Appellant carried a knife in an overnight bag, Louis said, and had told him the previous night that he had done something awful and would not be home for some time. Louis phoned the Y.M. C.A. and reported to officer Buch that the appellant had spent the night there, but was coming to the theater. The officer verified the fact that John Naples had checked out of the Y.M.C.A. When John Naples arrived at the theater carrying a canvas bag, the officers arrested him.

■ There was probable cause[4] for the officers without warrant to arrest John Naples. Since there was probable cause for the arrest, the officers were justified in examining the canvas bag in which they found a bayonet and various other articles which properly were received in evidence at the trial.

## II (a)

Following the arrest at 1:15 P.M., the prisoner was brought to Precinct No. 9, arriving about 1:30 P.M. Lieutenant Culpepper there in charge immediately informed Naples that he need not make a statement, that he did not have to say anything. Naples replied "I know that." Culpepper asked Naples if he thought he would feel better if he told the truth. Naples responded: "The truth about what?"

The officer then asked "Haven't you done something that you know is wrong and that you are ashamed of?" As Naples replied "Do you mean about the lady?," the lieutenant said "Yes." The trial judge overruled defense counsel's objections to further testimony as to the statement then given by Naples. The officer related the explanation by Naples as to what had occurred the previous night.[5] Naples had entered No. 225, next door to his own residence, looking for something to steal. He saw that Edna Jewel's door was slightly open; he ascertained that no one was then present, entered the apartment and searched it, took two dollars from a table drawer, and was entering a closet when the victim came in. She screamed at him and threw a book at him.

"He said that at that time everything went dark. He did not remember anything until he came to. He saw the lady on the floor, there was a lot of blood about, and he knew that he had hurt her."

Lieutenant Culpepper showed Naples the knife which had been taken from his canvas bag and asked about it. Naples said that was the one he had with him in his bag when he went into the apartment. He added that when he came to, he had the knife in his hand and there was blood on it.

■ The entire conversation did not take over five or ten minutes. There was no suggestion on the record that the Naples statement was other than completely voluntary and spontaneous. The trial judge correctly[6] ruled that the Na-

4. Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Ellis v. United States, 105 U.S.App.D.C. 86, 264 F.2d 372, cert. denied, 359 U.S. 998, 79 S.Ct. 1129, 3 L.Ed.2d 986 (1959).

5. Details from the transcript appear in 192 F.Supp. at 27, 28.

6. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915 (1959); Trilling v.

ples admissions to Lieutenant Culpepper might be received in evidence.

## II (b)

After the admissions by Naples, the police clearly were in position to present him before a committing magistrate. Available then was the further evidence to be supplied by the apartment manager who had discovered the body. The testimony of the coroner and that of police at the scene could have been adduced. In sum, with ample basis upon which to proceed. Naples was not then brought before a magistrate, although Fed.R. Crim.P. 5(a), 18 U.S.C.A. expressly provides that a person arrested without a warrant shall be taken without unnecessary delay before a magistrate at which time "complaint shall be filed forthwith." The Supreme Court has explained, "Provisions related to Rule 5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest available magistrate." [7] Naples, however, was not then "processed" through the ordinary administrative steps. Another course was in prospect. Indeed, he was not presented before a magistrate until 4:30 P.M. or 5 P.M., and so was not "as quickly as possible" [8] advised of his rights.

Instead, Naples about 1:55 P.M. was put in a police cruiser with three officers. Two others followed in another car. Captain Hartnett testified he then told Na-

ples he would like to stop at the apartment on the way from Precinct No. 9 to police headquarters "so we could go through and let him show us exactly what transpired there, and he said that he was willing to do it." The five police officers accompanied Naples into the apartment, to the scene of the homicide.

In the first Watson case, which was pre-Mallory, we pointed out with reference to a "reenactment" that "the police were not yet through with him." [9] We noted that the Government is under a particularly heavy burden to establish consent as basis for a waiver of constitutional rights "where the individual is under arrest," [10] a principle no less apt where a question of applicability of the exclusionary rules is under consideration. In the second Watson case, post-Mallory, a unanimous court struck down evidence secured during a "reenactment" carried out after a time when the accused should have been presented. The prosecutor there had offered such evidence despite this court's earlier clear ruling. We would expect that the Government would not again, at least under circumstances such as were shown here, proffer evidence that a so-called "willing" but unwarned and uncounselled accused reenacted a "crime" during a period of unnecessary delay within the meaning of Rule 5.

■ Defense counsel objected to evidence of statements made by, and police description of the actions of, the accused during the course of the reenactment by

United States, 104 U.S.App.D.C. 159, 260 F.2d 677 (1958); Heideman v. United States, 104 U.S.App.D.C. 128, 130, 131, 259 F.2d 943, 945, 946 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed. 2d 767 (1959); Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (1957); cf. Tillotson v. United States, 97 U.S. App.D.C. 402, 403, 231 F.2d 736, 737, cert. denied, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. 1502 (1956).

7. Mallory v. United States, 354 U.S. 449, 453, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

8. Id. at 454, 77 S.Ct. 1356. To demonstrate that the reenactment here was not infected with "delay," the prosecutor argued "I believe the court recognizes that

even committing magistrates are entitled to their noon hour, lunch."

9. Watson v. United States, 98 U.S.App.D. C. 221, 226, 234 F.2d 42, 47 (1956). There, we denied the Government a rehearing on this very reenactment point.

10. Watson v. United States, 101 U.S.App. D.C. 350, 352, 249 F.2d 106, 108 (1957). It is a singular fact, that not only did the prosecution here fail to establish a basis for the reenactment, it seems not to be aware of the holdings of this court on the subject. Although appellant's counsel cited both Watson cases, the Government has not mentioned them or sought on brief to distinguish them.

the unwarned and uncounselled prisoner. The objection should have been sustained.

## II (c)

Over objection by trial counsel, an officer was permitted to narrate details of a conversation with the prisoner. The trial judge had already ruled that the evidence gleaned during reenactment was admissible, erroneously as we have noted. He felt that a like ruling would apply to the admissions at the jail, but stated the Government must show that such admissions were voluntary. The questioned episode occurred at the jail, December 19, 1958, two days after Naples had been presented before the magistrate. He had then received instructions as to his right to remain silent and as to his right to have counsel—but no attorney had yet been appointed for him.

As we presently review the record, it is difficult for us adequately to reconstruct the circumstances. The transcript shows, however, that the judge had said as part of a series of comments:

"You know, I do not believe in this undue tenderness to persons accused of crime. It does not help the innocent; it only aids those who are guilty."

Presently the judge further observed:

"After all, the basic principle of admissibility of confessions is, was it voluntary [11], because an involuntary confession is unreliable and, moreover, it is contrary to modern civilized methods of administering justice to obtain a confession by coercion. *All these other rules are purely artificial, they do not go to matters of substantial justice.*" (Emphasis supplied.)

Again, in this connection, referring to our Goldsmith case, infra, the judge remarked:

"The Court of Appeals in that case makes it very clear that the rule of the Mallory case does not apply to statements made after arraignment; that, after all, the purpose of the Mallory case is to prevent delay in arraignment *and to penalize the public,* through their agents, if prompt arraignment is not had." (Emphasis supplied.)

Such animadversions do not coincide with our understanding of the law, nor with what this court has said. The Supreme Court specifically declared that its exclusionary rule is deemed necessary in order "adequately to enforce the congressional requirement of prompt arraignment." Thus, "statements elicited from defendants *during a period of unlawful detention*" [12] (emphasis supplied) are rendered inadmissible. Mr. Justice Reed, retired, sitting by designation, wrote for this court: "The bar against admissions after prohibited interrogation is *not to penalize the police or the public* for the error but *to protect the rights of the accused.*" [13]

Thus the purpose of the Mallory rule is *not* to "penalize" either the police or the public. Nor is the test solely whether or not the statement is voluntary. The question presented in cases of post preliminary hearing admissions is: Have the rights of the accused been protected?

In Goldsmith v. United States [14] and in Jackson v. United States [15] we dealt with

---

11. The single dissent in McNabb v. United States, 318 U.S. 332, 348, 63 S.Ct. 608, 87 L.Ed. 819 (1943), would have rested admissibility solely upon the "voluntary" test. But the majority view in McNabb, Rule 5 and a unanimous Court in Mallory have spelled out the principles which must be applied in these situations.

12. Mallory v. United States, supra note 7, 354 U.S. at 453, 77 S.Ct. at 1359.

13. Porter v. United States, 103 U.S.App. D.C. 385, 393, 258 F.2d 685, 693 (1958), cert. denied, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959).

14. 107 U.S.App.D.C. 305, 277 F.2d 335, cert. denied sub nom. Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed. 2d 86 (1960).

15. 109 U.S.App.D.C. 233, 285 F.2d 675 (1960), cert. denied, 366 U.S. 941, 81 S.Ct. 1666, 6 L.Ed.2d 852 (1961).

circumstances and situations unlike what the record here discloses. In both those cases, the accused had been presented before a magistrate who had imparted the judicial caution called for by Mallory. In both cases, the accused had counsel who had warned the accused of his rights in accordance with Rule 5. We saw in such circumstances that Mallory did not apply to post preliminary hearing admissions since the reason for the exclusionary rule no longer governed—on the facts presented.

Here, the initial, spontaneous declarations, so soon after arrest, have been found to be admissible. Naples when presented for preliminary hearing had received the Rule 5 warning. At the jail, the officer testified, he had advised Naples that he need not talk to the officers. He had already consented to the interview in response to the officer's written request for permission to talk with him. According to the officer, Naples said that "he had already told the rest of the policemen and he saw no reason why he wouldn't tell me."

Of course, Naples did not know that what he had said to the officers during the reenactment was not properly to be received in evidence against him. The interview occurred more than a year before our Goldsmith decision.

"By Mr. Murray: Q Mr. [Officer], I think the Court has assumed, and Mr. [Prosecutor] has assured us that your only reason for going to the jail to talk to this defendant was to satisfy what might be the additional requirements in the application of the Mallory rule, is that correct?

"A That is correct."

Enough has been said to demonstrate that the record here is unsatisfactory, and in our judgment, inadequate to predicate a determinative ruling in so important and delicate a field. Since we reverse on other grounds, we will withhold our decision on this question.

### III

Shortly after the arrest of Naples, on the Government's motion, the District Court ordered a mental examination which in December, 1958 was begun at D. C. General Hospital. On January 16, 1959, ten days before the indictment was filed, Attorney Murray [16] appeared before Judge Holtzoff to submit an affidavit of poverty executed, not by Naples but by his mother. It developed that the defendant was already undergoing a psychiatric examination, and counsel explained that when he saw Naples, "He certainly was not then fit to execute an affidavit." Accordingly Naples was allowed to proceed without prepayment of costs.

Counsel thereupon submitted a proposed order which would have authorized Naples to employ a psychiatrist of his own choosing at Government expense that he might examine the accused at a time "not too far distant" in order "to insure that the defendant's rights are fully preserved." Although Government counsel interposed no objection, the trial judge ruled that he would not "permit any defendant, at Government expense, to employ a psychiatrist of his own choosing, which means that a defendant can shop around for a favorable expert witness, and then have the Government pay for it. I don't consider that good administration of justice." [17]

On February 3, 1959, Dr. McIndoo, then assistant chief psychiatrist at the D. C. General Hospital, filed a report. It disclosed that Naples had been admitted on December 23, 1958, and that "Psychiatric examination, including psychological and neurological testing, indicates that Mr. Naples is psychotic, incompetent, and in-

16. The opinion of the trial judge disclosed: "The defendant has been ably and zealously represented by counsel appointed by the Court, Mr. Charles B. Murray, a well known member of the bar with many years' experience in the trial of important causes, and chief of the Legal Aid Agency." 192 F.Supp. at 25.

17. The United States Attorney, however, engaged for the Government the services of Dr. John R. Cavanagh, a well known psychiatrist.

capable of participating in his own defense."

Judge Holtzoff made clear his view that a hearing should be held at which testimony might be offered concerning the mental competency of the accused. He felt he should not act on the certificate alone since this was a case of murder in the first degree.

At the hearing set for February 20, 1959, Dr. Cavanagh and Dr. James A. Ryan were present. The latter, assistant chief psychiatrist at D. C. General Hospital, testified that he had observed Naples on two occasions for a period of one hour each, that he saw him on four or five occasions for periods of from 10 to 15 minutes each, and that in making his daily ward rounds, the doctor had observed Naples in the ward "almost daily for a period of five or six weeks." On the basis of his various examinations and other information, he concluded that Naples "has an undifferentiated type of psychosis; that he has a kind of mixed psychotic disorder in which there are elements of an organic brain condition, elements of a condition of temporal epilepsy, in that by reason of the total disorganization of his personality, due to both the organic illness and the psychotic disorder, that he was really unable to stand trial, really not competent to stand trial."

Also called *then* [18] by the Government was Dr. Cavanagh, identified by the judge as "a well known psychiatrist." He had examined Naples at the D. C. General Hospital, February 8 and 15, 1959. In addition, he testified, he had conferred with several of the psychiatrists at D. C. General Hospital, had read the Naples record completely and had a consultation with his mother. Naples had stated in his own words, "I am here charged with murder in the first degree. I am supposed to have done it. I don't remember doing it. She came in while I was in the front room. * * * She said nothing. She may have hit me with a pocketbook [*sic*]; I don't know. When I woke up, I was on top of her. I don't know how I got the knife out, but when I came around to [,] the knife—I usually carried in my bag was in her."

Naples, born February 19, 1939, had been unable to speak anything but gibberish until he was eight and one-half years old. He attended a special school until he was seventeen, doing poorly at school. He had been in military service for about a year but was discharged after a court martial at which he had been charged with assault with a dangerous weapon.

Following a head injury suffered by Naples in October, 1952, the hospital had records of repeated electro-encephalograms which showed positive changes, probably indicating brain damage.

Doctor Cavanagh concluded that Naples was not competent to stand trial.

"The Court: Is he psychotic, doctor?

"The Witness: Yes, Your Honor.

"The Court: And what is the form of his psychosis?

"The Witness: He has psychosis which contains elements which are suggestive of a number of disorders. For this reason, I would call it a psychosis unclassified."

█ The judge thereupon found the defendant incompetent to stand trial. An order was entered committing Naples to St. Elizabeths. Since the medical evidence, as above compendiously set forth, actually then became available to the defense, and in greater detail was utilized by Naples at trial, we will not say that he was prejudiced by the refusal to permit him to call a psychiatrist of his own selection.[19]

---

18. When the trial was held two years later, the Government did not call Dr. Cavanagh. We are not without the benefit of his testimony, however, for he testified at the request of the defense.

19. Cf. United States ex rel. Smith v. Baldi, 344 U.S. 561, 568, 73 S.Ct. 391, 97 L.Ed. 549 (1953); McGarty v. O'Brien, 188 F. 2d 151, 157 (1 Cir.), cert. denied, 341 U.S. 928, 71 S.Ct. 794, 95 L.Ed. 1359 (1951);

## IV

Some two years later, as the trial was about to go forward on February 6, 1961, trial counsel and Naples, with the consent of the prosecutor and the approval of the judge filed a written waiver of trial by jury, on its face in accordance with and as permitted by Fed.R.Crim.P. 23. Present counsel argue that the waiver was erroneously approved in that Naples was incompetent and could not appreciate the significance of his action. They point to the fact that only a week earlier, trial counsel, relying upon Dusky v. United States,[20] had once again moved for a mental examination as to the defendant's competency to stand trial since he was unable properly to assist in his own defense. The motion set forth also that Naples had no recollection of facts which counsel felt should be discussed for proper preparation for trial.

Trial counsel's supporting memorandum traced the series of mental examinations which had been conducted over the previous two years. It was noted that on January 12, 1961, St. Elizabeths had reported to the court that Naples was then competent to stand trial.[21]

Although there had been an evidentiary hearing on February 20, 1959 when appellant had been certified by the hospital authorities as incompetent to stand trial, there was none when St. Elizabeths certified him competent, as noted. The record shows that appellant's January 30th motion was denied on January 31, 1961.

The trial judge in his opinion stated with respect to the jury waiver:

"Mr. Murray very candidly and cogently explained, however, that he had reached the conclusion that the rights of the defendant would be better protected by a trial by the court alone, than by a jury trial. His reasons need not be discussed here." [22]

Present counsel argue that on this record appellant himself could not have made an intelligent and knowing waiver—he simply was not competent to do so. They point to the questions put to the appellant to each of which he simply answered "Yes." We paraphrase:

You understand you are entitled to be tried by a jury? You understand that if you are found guilty of first degree murder, the penalty is death? And knowing that, you prefer to be tried by the court without a jury? Rather than by a jury?

█ It is insisted that the courts will indulge every reasonable presumption against waiver of constitutional rights. Whether there has been an "intelligent" waiver depends upon the facts and circumstances of a particular case "including the background, experience, and conduct of the accused." [23] The Supreme Court has said that a trial judge bears a serious and weighty responsibility of determining "whether there is an intelligent and competent waiver by the accused. * * * and it would be fitting and appropriate for that determination to appear upon the record." [24]

Of course there is "nothing in the Constitution to prevent an accused from choosing to have his fate tried before a judge without a jury even though, in deciding what is best for himself, he fol-

Curry v. Overholser, 109 U.S.App.D.C. 283, 286, 287 F.2d 137, 140 (1960), and cases cited.

20. 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), reversing 271 F.2d 385, 395 (8 Cir.1959).

21. The report read in part "that John A. Naples is mentally competent to understand the nature of the proceedings against him and to consult [sic] properly with counsel in his own defense."

22. 192 F.Supp. at 25. We have searched in vain for some record disclosure of what had been "candidly and cogently explained" by counsel. Questioned at argument, Government counsel could point to no such references.

23. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

24. Id. at 465, 58 S.Ct. 1023.

lows the guidance of his own wisdom and not that of a lawyer." [25]

Whether this appellant was capable of "deciding what is best for himself" is a very serious question. We have concluded, however, that, lacking an adequate record, we need not undertake to resolve that question since we are to reverse on other grounds.[26]

■ It might have been expected, in light of what the Supreme Court has said, that the judge's determination to approve the waiver of a jury trial would have been supported by findings adequate to sustain his ruling. Particularly would such a course have been appropriate here, in a capital case, with a two-year, pretrial record indicating the possible presence of a substantial mental disorder.

### V (a)

Relied upon throughout was appellant's defense that he was entitled to a finding of not guilty by reason of insanity at the time of the homicide. In Misenheimer v. United States,[27] we reemphasized that in this jurisdiction "the ultimate issue of responsibility is whether the criminal act is the product of a mental disease or defect," as established in the Durham case. We pointed out that upon

"that issue, the jury's range of inquiry is not to be limited to particular symptoms, but may include * * * any symptoms and manifestations of mental disorder. * * * In a case like the present [where the defense was "irresistible impulse"] the jury would consider whether the act was

committed by reason of an irresistible impulse due to a mental disorder. A similar approach should be taken with respect to any matters offered in evidence as indicative of mental disorder, such as, for example, inability to distinguish between right and wrong. The decision of the jury must, of course, rest on the testimony in the particular case." [28]

It is thus clear that this court expects a wide range of inquiry to be permitted which will include "any symptoms and manifestations of mental disorder."

Here the appellant's statement to Lieutenant Culpepper, text supra II, disclosed that Naples had been surprised in the victim's apartment. When she threw a book [or pocketbook] at him, everything went black. He did not remember what he did thereafter. When he came to, he discovered the victim's body on the floor, and with blood about he knew "that he had hurt her."

Such evidence was consistent with the pattern observed by those specialists who earliest in point of time after the homicide had studied the case and had examined Naples and his mental record.

The testimony of Dr. Ryan at the February 20, 1959 hearing, before the same judge who later tried the case, related to the examinations of Naples at D. C. General Hospital within a few weeks of the homicide. During an electro-encephalographic examination—an E.E.G.—"he actually had a seizure pattern, he had an epileptic seizure during the course of his brain wave testing." [29] Naples had a

25. Adams v. U. S. ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942); Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930).

26. Moreover, we do not overlook the fact that the waiver here was presented by a highly competent trial attorney who zealously had guarded all rights of the accused throughout a two year period. Armed with a thorough knowledge of his case and its problems, he may have made a tactical decision based on his anticipation of the course which might develop. As noted, we certainly are not sufficiently advised to conclude that he erred in submitting the waiver, or that the trial judge erred in approving it.

27. 106 U.S.App.D.C. 220, 221, 271 F.2d 486, 487 (1959).

28. Ibid.

29. Dr. McIndoo at trial supplied details. On January 6, 1959, Naples during an E.E.G. experienced a seizure of the "grand mal" type. On January 9, 1959, another of several E.E.G.'s was done. "I don't believe there ever was a normal one obtained on this man," she testified.

history of epilepsy "which goes back a number of years, of which we have old records," the witness said.

The judge asked whether the condition was caused by a disease or an injury. The witness answered:

"Well, let me say that an injury or disease may be the same thing in medical terms.

"The Court: No, they do not. The word 'injury' means in medical terms, I think, what doctors call trauma."

The witness explained further that there might have been an injury at birth or some other cause "which results in a diseased condition of the brain." The exact basis could not be known. "But there was some condition present from very early in his life which resulted in pathological changes in the brain."

The judge later asked: "Is there a *name* for the organic disease? That is the question. What is the *name* of the organic disease, or has it a name?" (Emphasis supplied.)

Dr. Ryan replied: "The name of the disease would be temporal lobe epilepsy."

For several months after the February 1959 hearing, Naples had been under treatment at St. Elizabeths.

On October 2, 1959, Mr. Murray renewed his motion of January 16, 1959 for the appointment of a psychiatrist, or at least that Dr. Cavanagh be asked to examine Naples. The Government opposed stating:

"An examination to be conducted at this late date would not serve to reveal to any psychiatrist the mental capacity of the defendant on the date of the crime."

Not until some two years after the homicide did the staff at St. Elizabeths report to the court an opinion as to Naples' mental condition as of December 16, 1958. The report dated January 12, 1961 concluded:

"We find no evidence of mental disease existing at the present time nor on or about December 16, 1958. He is not suffering from mental deficiency."

Meanwhile—and without our presenting a detailed analysis of all material— St. Elizabeths by report dated July 13, 1960 had said:

"In our opinion, John A. Naples is suffering from a mental illness, personality disorder, at the present time and was suffering from this personality disorder on December 16, 1958, but we find nothing to indicate that the alleged crimes were the product of this mental condition."

Dr. McIndoo, August 5, 1960, advised the court that Naples had been readmitted to the D. C. General Hospital for a specific determination of his mental condition at the time of the crime.

"This man has a serious personality disorder of the sociopathic type which is so poorly controlled under stress situations, he functions as a psychotic person. It is my opinion the crime is the product of his psychotic sociopathic personality."

Dr. Cavanagh's report of July 22, 1960 was related back to December 16, 1958. He summarized that as of February 8 and 15, 1959, Naples was suffering from psychosis unclassified (which probably developed after the date of the homicide); chronic brain syndrome; retrograde amnesia; and epilepsy, and was still so suffering in July, 1960.

As to December 16, 1958, his diagnosis specifically was that Naples had been suffering from chronic brain syndrome (post-traumatic), and epilepsy, psychomotor seizures.

"In regard to causality:

"If by cause is meant would he have committed the crime if he did not have the disease?—I do not know.

"If by cause is meant did he commit the crime because he had the disease? I do not know. He has had the disorder for many years. There is a history of two previous assaults (unverified) but no previous history of homicide.

"If by cause is meant a necessary relationship of cause and affect [sic] between the illness and the offense— I would say that if my opinion is correct that he suffered from a psychomotor epileptic seizure as a result of the sudden startling attack from the rear, there would seem to be a definite relationship between the seizure and the alleged homicide. This would not be true of the housebreaking and larceny, because these occurred before the seizure, at which time his mental illness was not causal."

We summarize the foregoing reports simply because they readily provide the background and may be taken as illustrative of the actual trial testimony,[30] which was supplied in far more complete detail.

The trial judge found the probative value of Dr. McIndoo's opinion impaired "by her rapid and unexplained change of view," [31] he said. He struck down Dr. Cavanagh's opinion, concluding that the doctor must have lacked certain data, "not available to him." [32] Otherwise, the judge assumed, "he would have reached a contrary result, namely, that there was no causal connection between the murder and the defendant's mental condition." [33]

Dr. Ionedes on November 22, 1960, and December 1, 1960, was chief of the Legal Psychiatric Services of the District Department of Welfare. On those dates at the jail, he examined Naples for a total of two hours. The assistant superintendent at the jail requested the examinations because of Naples' conduct. Naples had tied his cell door with a sheet when he wanted to burn himself up and had set his blanket and mattress on fire. He had lost 12 pounds in seven days because he refused to eat.

Dr. Ionedes believed Naples had been coming out of "an acute psychotic reaction." He had not seen the patient sufficiently to determine whether or not the psychosis stemmed from an organic origin. Before making a diagnosis of schizophrenia or organic brain disease, he would wish to be "completely sure." "To be sure, I have to have physical examination, E.E.G., psychologicals, and social history and a long history about his background."

But Naples "was in such a condition" that the doctor recommended further treatment and observation at St. Elizabeths.

On December 16, 1960, the staff at St. Elizabeths was asked—for the first time —to examine Naples and thereafter to submit to the court an opinion as to whether Naples suffered from a mental illness at the time of the homicide, exactly two years earlier. The staff also was to report if mental illness were found, as to whether or not "it was a productive force in causing the acts." In response to the request of the District Court a staff conference was held on January 9, 1961.

Dr. Overholser was called to explain the views of St. Elizabeths staff. The "personality disorder" from which Naples suffered, he said, is a mental illness, but "in the strict sense," not a mental dis-

---

30. Summary of Dr. Cavanagh's testimony appears in 192 F.Supp. at 43–45. In Dr. Cavanagh's opinion given at trial, the chronic brain syndrome from which Naples was suffering on December 16, 1958 was a permanent mental defect due to a brain injury. Additionally, when Naples attacked his victim, he was in an epileptic seizure so that the homicide was the product of his mental condition.

31. 192 F.Supp. at 45. But she clearly persisted in her opinion that the homicide was the product of mental illness. Naples had a "sociopathic personality with psychosis," she testified. Earlier an "undifferentiated psychosis" had been discerned. She did not consider the epilepsy to be a "major reason" for her diagnosis of psychosis.

32. Ibid.

33. The judge relied in substantial part upon evidence by Captain Hartnett derived from the reenactment which, as we have ruled, was erroneously received.

ease.[34] The doctors from St. Elizabeths "found" no evidence of epilepsy, despite the earlier records and the testimony of Dr. Cavanagh and the psychiatrists from D. C. General, and that of Naples' mother, and others.

The trial judge found himself "strongly of the opinion"[35] that the death sentence should not be carried out. He announced his intention to recommend to the Attorney General that there be a commutation to life imprisonment, with a provision that Naples not be eligible for parole. The evidence, he wrote, established that Naples is "mentally responsible" for his acts, but "it also demonstrates that the defendant is mentally below the average and is in fact subnormal. All psychiatrists agree that at least he has a personality disorder. * * * In my opinion dictates of reason and humanity bar the infliction of a death sentence on a person such as this defendant."[36]

Counsel argue that the trial judge clearly did *not* find that the Government had proved beyond a reasonable doubt that Naples was free from mental disease or defect. They contend additionally that the judge *could* not, reasonably, have found that the Government had proved beyond a reasonable doubt that the homicide was not "the product of Naples' disordered condition."

## V (b)

"The real error" counsel argue on brief,[37] "is the Court's finding that the Government proved the killing was not the product of Naples' mental derangements." That result obtains, it is contended, since this appellant received a "trial by label" which, in fact, was no trial at all. We deem it unnecessary now to set out the details predicating this aspect of appellant's claims. Rather, we think it sufficient to observe generally, that many of the expressions in the opinion can scarcely be reconciled with what seem to be the spirit and tone of the trial itself, as revealed by the whole record. Simply stated, the judge seems to have taken the view that this appellant while perpetrating a housebreaking took the life of another. Thus he is guilty, other considerations aside, and on the felony murder count *must* be sentenced to die, but *should* not be. Instead, the judge concluded that Naples should be sentenced for life—with no opportunity for parole.

It seems unmistakable that the opinion of the trial judge largely reflects the personal views of the author. Ranging from his interpretation of the Mallory rule,[38] the Durham decision[39] and others, we find dissertations on the subjects of insanity, the difficulties of diagnosis en-

34. Examined by Mr. Murray, the terms "mental disease, disorder and illness," Dr. Overholser said, are in a general way, "usually used as being synonymous. Disorder is, I should say, a more inclusive term than either illness or disease. Disease is something reasonably specific. Illness is somewhat more generic. But disorder, I think, includes somewhat more than either of the other two."

35. 192 F.Supp. at 45.

36. Ibid.

37. They rely upon Carter v. United States, 102 U.S.App.D.C. 227, 234, 252 F.2d 608, 615 (1957). Counsel further argue, in effect, that the trier affirmatively should have found that the homicide would not have occurred "but for" the concededly established personality disorder, and would have been bound so to find if the

testimony of Dr. McIndoo and Dr. Cavanagh were to be accepted. 102 U.S.App. D.C. at 236, 252 F.2d at 617.

In answer to the judge's question, "If he said that to one of the officers, would that have any effect on your opinion or your answer?," Dr. Canavagh replied: "No, Your Honor * * *." He would base his opinion on what he was able to elicit "rather than to depend upon the assertion, for instance, of a police officer who said that [Naples] would say certain things."

38. See comments during trial on counsel's objection to the "reaffirmation" statements, text supra II (c).

39. As to Durham, the judge seems to have deemed it essential to his thinking here to collect citations of cases wherein other courts have refused to follow the rule which obtains in this jurisdiction.

countered by psychiatrists, the burden of proof on the issue of insanity as established by Congress for the District of Columbia and many other topics. It is impossible to discern from the opinion to what extent the trial judge's conclusions as applied to Naples were colored by his own views; what weight for example, was given to his pronouncement that "Congress shifted the burden of proof from the Government to the defendant to establish the defense of insanity, instead of requiring the Government, in effect, to disprove it."?[40] Despite his expressed opinion that the burden had been so shifted, we are told he would not act on that premise without giving counsel a chance to be heard.

Despite the many instances wherein we have considered the delicate problems which arise where insanity is relied upon as a defense, the opinion of the trial judge makes no citation of or reference to a single case decided by this court since Durham. So it went in other respects.

We turn now to one final episode. The trial was commenced on February 6, 1961 and continued until February 21, 1961. The opinion of the trial judge was filed March 9, 1961. On March 24, the court denied a motion for a new trial. Agreeably to the provisions of Fed.R.Crim.P. 32(a), Mr. Murray then moved for sentence on all counts, but the judge pronounced sentence only on the felony murder count. Leave to appeal in forma pauperis was promptly granted, but the judge desired that counsel file an application for executive clemency. Mr. Murray announced his willingness to go forward with the appeal, but was not at all willing first to apply for executive clemency.[41]

As counsel entirely familiar with the record, he undoubtedly had reasonable ground to expect to be able to demonstrate reversible error on various grounds. He made it clear that he did not wish to be put in the position of accepting a judgment of conviction of first degree murder and thereupon be required to seek executive clemency with respect. to the sentence of death which had been imposed. It may be sensed that with his client's life at stake, he was unwilling to insulate from review, the rulings on points he had deemed subject to objection. He might have felt that on appeal the murder convictions could be reversed even though the convictions of breaking and entering, and larceny, might be permitted to stand. Such considerations as a matter of tactics were not unreasonable, especially in view of Naples' original admissions as to the facts predicating the latter counts.

Mr. Murray stated frankly his intention first to seek disposition of the appeal. The judge said that if Mr. Murray intended to pursue that course, "I would designate someone else who would be of a different opinion."

Thereupon, Mr. Murray made clear that he would not "interfere" with the appeal by making a motion for clemency. "I will not file a petition for clemency while the appeal is pending if I am the attorney."

"The Court: I never want to designate any counsel who is reluctant to pursue a course suggested by the Court and I feel that I should appoint someone else under those circumstances."

The judge stressed his recommendation in the belief that commutation of sentence would more promptly be accorded by the

---

40. 192 F.Supp. at 39, 40. See D.C.Code § 24–301 (Supp. VIII, 1960) which applies to "an exceptional class of people —people who have committed acts forbidden by law, who have obtained verdicts of 'not guilty by reason of insanity' * * *." Overholser v. Leach, 103 U.S. App.D.C. 289, 291, 257 F.2d 667, 669 (1958), cert. denied, 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959); again, under that section, had Naples been found

not guilty by reason of insanity he would have been committed to a mental hospital there to receive treatment and not to be released except as provided therein. Williams v. United States, 102 U.S.App.D.C. 51, 250 F.2d 19 (1957).

41. 28 C.F.R. § 1.9 (1949) provides: "Petitions for Executive clemency will not be submitted to the President pending appeals from judgments of conviction. * * *."

Attorney General than if an appeal were first taken. "You know, in this respect the English procedure is far superior to ours." [42]

Mr. Murray, unmoved, was finally permitted to withdraw as counsel. He volunteered to assist whatever counsel might be named.

Like Mr. Murray during the trial, present counsel in charge of the appeal have diligently devoted their attention to the case. They have pressed each of the points upon which Mr. Murray had preserved the record. We will not go as far as they in saying there was no trial at all. We do agree that Naples should have a new trial—before a different judge. [43]

Reversed. [*]

BURGER, Circuit Judge, concurs in the opinion of the court but sees no occasion to require the new trial to be conducted by a different judge.

BASTIAN, Circuit Judge, with whom WILBUR K. MILLER, Chief Judge, joins, dissenting.

We think it would not be useful to discuss in detail the majority opinion, but the fact that we refrain from doing so should not be construed as an indication that we agree with its factual or legal conclusions. In passing, however, we note that, although the District Judge expressed dissatisfaction with the Durham rule, as have other courts and some judges of this court, he nonetheless followed that rule. We find, in the opinion of the District Judge, 192 F.Supp. 23 (1961), at page 40, the following language:

"The court will, therefore, decide this case on the theory that this burden has to be borne by the Government, and that unless the court finds that it has been established beyond a reasonable doubt, that the crime was not the product of any mental disease or any mental defect, the defendant should be found not guilty on the ground of insanity."

Our principal purpose here is to dissociate ourselves from the ruling of the majority that, upon remand, the case must be tried before a different judge. We consider this a reflection on a distinguished member of the District Court whose ability and integrity are well known. We think a reading of the judge's opinion indicates the meticulous care and attention which he gave to this case. There is no reason to believe that the District Judge would not follow the rules laid down by this court in its majority opinion if he were chosen by the Chief Judge of the District Court to retry this case. Whether or not he made a mistake in his suggestion that this matter be referred to the Attorney General for executive clemency prior to appeal or after is immaterial. Even though he thought Naples was guilty of the heinous crime of which he was convicted, the judge was of the opinion that Naples should not be put to death for it, although under the law as it then existed the judge was powerless to impose any penalty but

---

42. Other "respects" as seen by the trial judge have been set forth in Holtzoff, A Visit to the London Courts: The Administration of Justice in England, 42 A.B.A.J. 29 (1956); Holtzoff, Expeditious, Efficient Justice: Observations on English Appellate Procedure, 44 A.B.A.J. 221 (1958). The author reported that appellate courts in England will disregard technical errors and reverse a judgment of conviction only if the appellate court is of the opinion that an unjust result has been reached, and that the decision of the trial court should be upset on the merits.

43. See Calvaresi v. United States, 348 U.S. 961, 75 S.Ct. 522, 99 L.Ed. 749 (1955); Blunt v. United States, 100 U.S. App.D.C. 266, 279, 244 F.2d 355, 368 (1957).

* The retirement of Senior Circuit Judge Prettyman became effective April 16, 1962. Prior thereto he concurred in the foregoing opinion and joined in the judgment of the court entered April 13, 1962.

**632**

that of death for murder done during the commission of a felony.

In our opinion, the crime was adequately proved and there was ample evidence to justify the finding that the defendant was not of unsound mind. But it is also true, as found by the District Judge, that "to require the defendant to spend many months in a death cell awaiting a final decision would in itself result in severe mental punishment and agonizing suspense." The court announced that he was prepared to allow an appeal *in forma pauperis*, and the suggestion that executive clemency should be asked first was not a condition precedent to the allowance of an appeal.